**SIERRA CLUB et al., Plaintiffs,**

v.

**William T. COLEMAN, Jr., Secretary of Transportation of the United States,**

**and**

**Norbert T. Tiemann, Administrator, Federal Highway Administration, Defendants,**

**Morrison-Knudsen Co., Inc., Intervenor-Defendant,**

**Constructora Emkay S. A., Intervenor-Defendant.**

**Civ. A. No. 75–1040.**

United States District Court, District of Columbia.

Sept. 23, 1976.

Leonard C. Meeker, Richard A. Frank, Eldon V.C. Greenberg, Center of Law and Social Policy, Washington, D. C., for plaintiffs.

Irwin L. Schroeder, Jr., U. S. Dept. of Justice, Washington, D. C., for defendants.

Thomas D. Finney, Jr., Thomas Richard Spradlin, Washington, D. C., for intervenors.

## MEMORANDUM AND ORDER

BRYANT, District Judge.

This matter is now before the Court on plaintiffs' motion for an extension of the preliminary injunction heretofore entered in this case and defendants' opposition thereto. This case was last before the Court eleven months ago, at which time the

Court found that defendants had failed to comply with the procedural and substantive requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, in their preparation of an environmental impact assessment relating to their construction of the Darien Gap Highway through Panama and Colombia. As a result, the Court enjoined further work on the project until such time as compliance with NEPA had been effected, 405 F.Supp. 53. Defendants have now complied with the procedural requirements of NEPA and produced a Final Environmental Impact Statement for the project, and now assert that they may proceed with the project. Plaintiffs contend that the FEIS is defective in certain critical areas, and argue that the injunction should therefore be extended. After an examination of the FEIS in light of the parties' arguments, the Court concludes that the statement is indeed so deficient in certain basic respects that the injunction must be extended until those deficiencies are remedied.

When this matter was last before the Court, the earlier assessment was found to lack sufficient discussion of the problems of control of aftosa, or foot-and-mouth disease (FMD), of the environmental impact of possible alternative routes for the highway, and of the effects of the highway on the Cuna and Choco Indians inhabiting the area through which the highway is expected to be built. While the FEIS is in general a significant improvement over the earlier assessment, and while the discussion of those three topics has been modified to various degrees, the FEIS still fails to adequately examine the environmental impact of the proposed Darien Gap Highway with regard to those matters.

 The premise from which any environmental impact statement must begin is the recognition that its goal is to provide a detailed discussion sufficient to allow the agency decision maker to fully consider in his or her decisional calculus the possible environmental effects of various alternative paths the agency might choose to pursue with respect to a given project. See, *Cal-vert Cliffs' Coordinating Committee v. Atomic Energy Commission,* 146 U.S.App. D.C. 33, 449 F.2d 1109 (1971); *Scientists' Institute For Public Information v. Atomic Energy Commission,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973); *Natural Resources Defense Council v. Morton,* 148 U.S.App. D.C. 5, 458 F.2d 827 (1972); *Carolina Environmental Study Group v. United States,* 166 U.S.App.D.C. 416, 510 F.2d 796 (1975). These cases also establish that the degree of detail required in the analysis depends on the circumstances and nature of the project involved. In the present case, the defendants propose to build the first major highway through a region until now almost wholly undisturbed by any encroachment of modern civilization, an area by all accounts constituting an ecosystem virtually unique to the world. A more paradigmatic example of the need for thorough and strict application of the requirements of NEPA could hardly be found, yet the defendants' compliance continues to reflect a minimalist approach to those requirements. While this may be due to their failure to recognize NEPA's applicability for literally years during the earlier phases of the project, that failure does not justify any relaxation of those requirements now.

 As was the case when this matter was first before the Court, the most significant environmental problem related to the proposed highway is the transmission of aftosa (FMD) into North America which will occur in the absence of stringent control measures along the highway and in Panama, Colombia, and other Central American nations. This problem, as well as the general background of the project, is more fully described in the Court's earlier opinion, 405 F.Supp. 53. The FEIS recognizes the potentially disastrous results of an outbreak of FMD in the United States alone, estimating that it might create a loss of $10 billion in domestic livestock in the first year alone, as well as possibly causing the extinction of certain endangered livestock species. Yet the statement concludes that the "increased risk of such an outbreak due to the construction of the Darien Gap

Highway is considered to be insignificant in light of the control programs now in existence in the U.S., Central America, Mexico and Panama and the control program now being developed in Colombia." FEIS at vi. A closer look indicates that while the Panamanian program is well-established, the Colombian program (being carried out under U.S. supervision, assistance, and financing) "has not accomplished all the objectives agreed upon" and that "[a]dministrative difficulties in Colombia have slowed purchase of equipment, building of quarantine facilities, movement of cattle herds located near the border, and other similar activities." FEIS at 6–17. Indeed, it is apparent that the only real basis for the initial optimistic assessment of no significant risk is the assertion that "[u]ntil the FMD program is in satisfactory operation, no highway construction in Colombia will be permitted. The degree of compliance will be determined by the U. S. Department of Agriculture." FEIS at 6–17. The FEIS, in other words, does nothing more than state the goals of the program; while the discussion of the proposed operation of the Colombian program is adequately detailed, it contains no reasoned analysis whatever of the likelihood that the program will in fact become fully reliable. In light of the history of FMD-control efforts in that nation, such a discussion is indispensable to consideration of whether the transmission of the disease can be effectively prevented in the near future. And without knowing the realistic likelihood of a reliable program during the relevant period, the agency cannot rationally conduct the balancing process required by NEPA.

A further problem with the discussion of FMD prevention undermines the validity of the FEIS. From the available discussion in the current FEIS and the attached comments, it does not appear likely that a completely effective FMD program will be functioning in lower Central America for the foreseeable future. Given what therefore must be regarded as at least the possibility that the disease may spread through the Darien Gap, a rational evaluation of the impact of the bringing of the gap by the highway on upper Central America and North America requires a clear understanding of the probable results of such a northward transmission of FMD. That understanding in turn requires an examination of the prospects for controlling the disease as it migrates northward, as well as of the actual impact of FMD in the affected areas. While the FEIS does adequately describe the devastation that might result from an epizootic (animal epidemic) of the disease in these areas, it entirely fails to consider the prospects for control of the disease in such areas. The Statement notes that substantial funds might be required to control the disease if any outbreaks should occur, but gives no indication of the magnitude of expenditures which would correspond to any of the various scenarios imaginable. Indeed, estimates by various commentators suggest that the funding now anticipated for aftosa control associated with the development of the highway may be too low by a factor of as much as one hundred or more. In order for the agency to give any meaningful consideration to the merit of the proposed project, it must know what the possible funding requirements associated with the project may be and whether such funds are likely to be available. Without such knowledge the balancing mandated by NEPA cannot be seriously undertaken.

■ The second fundamental deficiency in the FEIS is its treatment of the impact of the project upon the lives of the Cuna and Choco Indians living in the Darien Gap region. The initial environmental impact assessment before the Court predicted possible cultural extinction for these tribes. The current statement again treats their fate in a cursory and casual manner, and makes no attempt at serious anthropological or ethnographic analysis of the impact of secondary development resulting from the highway upon these people. It asserts that the Chocos in Panama "are adaptable and will probably become incorporated . . . into the national economy", whereas the Cuna "are more traditional and are expected to retain their cultural identi-

ty", FEIS at 6–27. Nowhere does the document deal with the highway's impact in significantly more depth. It asserts that the "Cuna will be little affected culturally by the influx of population and the economic growth of the region as long as extensive forest habitat is maintained. Their traditional village life and strong community organization will resist change as it has always done." FEIS at 6–28. The FEIS then completely vitiates the predictive value of these generalizations by concluding that if "the colonists are permitted to cut trees without restraint, they will cause drastic alteration of the Cuna culture", and that the "extent of actual changes depends entirely upon the implementation of the proposed OAS land use plan." FEIS at 6–28. The statement does not seriously discuss the contents of that plan or its current status or the prospects for its approval or enforcement. With regard to the Chocos in Panama, the statement notes that they will be similarly affected in the few places where they have started to build villages, but the majority of the "transitory riverine Choco, who build temporary shelters along stream banks, will simply move farther upstream when the pressures of population become too great." *Id.* This statement too is undermined by the qualification that the extent of the changes will be determined by the possible application of the OAS land use plan. With regard to consideration of the impact upon the two tribes in Colombia, the statement is limited to the following analysis: "The Cuna have lived much as they do today for several centuries, and their traditional life and strong political organization and traditional solidarity have resisted first the Spaniards and then the Colombians, and will continue to resist change. The Chocos will be little affected." FEIS at 6–31.

This treatment does not satisfy the requirements of NEPA. While even the certainty of cultural extinction for both tribes would not necessarily preclude approval of the project, NEPA requires that the agency make such a decision knowingly and with due regard for its environmental consequences. In light of the critical comments in response to the draft EIS, particularly those of Arturo Muñoz of the Stanford University Center for Latin American Studies, FEIS at 12.10, and the predictable pressures for secondary development that will accompany completion of the highway, the FEIS simply does not provide the information which would be needed for such informed balancing and decision-making in this regard. The speculation and conjecture with which the document's discussion is replete are not justified by any limitations of available information sources or analytical tools, and do not satisfy the agency's obligations under NEPA.

Finally, the statement's discussion of possible alternatives to the Atrato route chosen in Colombia continues to be inadequate. When this matter was before the Court last October, the earlier assessment's treatment of alternative routes was found to be critically deficient. The comments made by the Court at that time are equally applicable to the current version, which is not significantly improved; the discussion is still devoted to an analysis of why the shorter (Atrato) route is preferable to the longer (Choco) route from the point of view of engineering and cost. Unfortunately, little of the discussion therein is addressed to the environmental impact of possible alternatives to the route actually selected (the Atrato route). Such a discussion of the environmental impacts of other land routes, such as the Choco route, is indispensable, though they might cost more or be less feasible from an engineering perspective. Accordingly, it is by the Court this 23rd day of September, 1976,

ORDERED, that plaintiffs' Motion To Continue In Effect The Existing Preliminary Injunction be, and hereby is, granted; and

FURTHER ORDERED, that defendants, their agents, officers, servants, employees, and attorneys, and any persons in active concert or participation with them, are hereby enjoined from entering into any contract, obligating any funds, expending any funds, or taking any other action whatsoever in furtherance of construction of the

Darien Gap Highway, except as specified by the Court's Order of December 23, 1975, pending final hearing and disposition of this action, or unless and until defendants have fully and adequately supplemented their Final Environmental Impact Statement, in the manner prescribed by law for the initial preparation of such statements, to remedy the deficiencies outlined in this memorandum. In preparing such a supplement, defendants may conduct any on-site studies that may be required to allow full and informed consideration of the issues involved.

IT IS SO ORDERED.