**SIERRA CLUB et al.**

v.

**Brock ADAMS, Jr., Secretary of Transportation of the U.S., and William M. Cox, Administrator, Federal Highway Administration, Appellants.**

No. 76–2158.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1977.

Decided March 14, 1978.

Carl Strass, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Raymond N. Zagone and Irwin L. Schroeder, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellants. Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellants.

Leonard C. Meeker, Washington, D. C., with whom Richard A. Frank and Eldon V. C. Greenberg, Washington, D. C., were on the brief, for appellees.

Thomas Richard Spradlin, Washington, D. C., entered an appearance for Morrison-Knudsen Co., et al.

Before McGOWAN, TAMM, and ROBIN-SON, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

This appeal by federal officials challenges a decision enjoining United States participation in the construction of the Darien Gap Highway in Panama and Colombia because of alleged deficiencies in the Final Environmental Impact Statement filed pursuant to the National Environmental Policy Act (NEPA).[1] Our jurisdiction is based on 28 U.S.C. § 1292(a)(1) (1970). Because we believe that the statement adequately fulfills the requirements of NEPA, we vacate the preliminary injunction and remand to the district court for further proceedings consistent with this opinion.

I

The Pan American Highway is a road system, extending from Prudhoe Bay, Alaska, to Santiago, Chile, which connects the capital cities of countries in the Western Hemisphere. There is only one section of the highway, which would traverse the Darien Gap in eastern Panama and the adjacent area of Colombia, that has not been completed.[2] The Darien Gap Highway, a 250-mile, paved road with termini at Tocumen, Panama, and Rio Leon, Colombia, has been proposed to complete the system.

On December 31, 1970, Public Law No. 91-605 was enacted, providing, in part:

The United States shall cooperate with the Government of the Republic of Panama and with the Government of Colombia in the construction of approximately two hundred and fifty miles of highway in such countries in the location known as the "Darien Gap" to connect the Inter-American Highway authorized by section 212 of this title with the Pan American Highway System of South America. Such highway shall be known as the "Darien Gap Highway".[3]

Under agreements between the United States and Panama and Colombia signed on May 6, 1971, the latter two countries undertook to provide not less than one-third of the cost of construction, with the United States providing the remaining two-thirds.[4]

On June 27, 1975, the appellees[5] brought suit in the United States District Court for the District of Columbia, alleging that the appellants Secretary of Transportation and Administrator of the Federal Highway Administration (hereinafter referred to as the Government) had failed to prepare and process an environmental impact statement on the Darien Gap Highway. Following a hearing, the district court, on October 17, 1975, granted a motion by the appellees and enjoined the Government from furnishing further assistance toward construction of the highway until it had complied with NEPA and applicable administrative regulations, including, but not limited to, the filing of an adequate environmental impact statement.[6] *Sierra Club v. Coleman,* 405 F.Supp. 53 (D.D.C.1975).[7]

---

1. 42 U.S.C. §§ 4321–4347 (1970 & Supp. V 1975).

2. Final Environmental Impact Statement (FEIS) at 2–1.

3. 23 U.S.C. § 216(a) (1970).

4. Agreements for Construction of the Panama & Colombia Segments of the Darien Gap Highway, May 6, 1971: United States-Panama, 22 U.S.T. 602, 605, T.I.A.S. No. 7111; United States-Colombia, 22 U.S.T. 617, 620, T.I.A.S. No. 7112.

5. Appellees are the Sierra Club, National Audubon Society, Friends of the Earth, Inc., and International Association of Game, Fish and Conservation Commissioners.

6. An "Environmental Impact *Assessment*" had been prepared and processed by the Government, but it was found to satisfy neither the procedural nor the substantive requirements of NEPA. *Sierra Club v. Coleman,* 405 F.Supp. 53, 54 (D.D.C.1975).

7. Following a further hearing, the court, on December 23, 1975, modified its injunction to permit the appellants

The Government then prepared and processed an environmental impact statement on the highway, and appellees were among those outside agencies that were asked to, and did, comment on the draft statement.[8] On June 15, 1976, the Government filed a "Notice of Compliance with Terms of Injunction," attaching a copy of the Final Environmental Impact Statement (FEIS) and stating that it believed it could resume assistance to the construction project on July 15.[9] The district court disagreed, and on September 23 granted appellees' motion to continue the preliminary injunction because of certain deficiencies in the FEIS. *Sierra Club v. Coleman,* 421 F.Supp. 63 (D.D.C.1976).

The district court found that, although the Government had complied with the procedural requirements of NEPA, 421 F.Supp. at 65, the FEIS it submitted inadequately examined the environmental impact of the highway with regard to three matters: 1) the control of aftosa, or foot-and-mouth disease; 2) possible alternative routes for the highway; and 3) the effect on the Cuna and Choco Indians inhabiting the area that the highway is expected to traverse. *Id.* at 65–67. Because of these deficiencies, and until they were remedied, the Government was enjoined from "entering into any contract, obligating any funds, expending any funds, or taking any other action whatsoever in furtherance of construction of the

Darien Gap Highway . . . ." *Id.* at 67–68. This appeal ensued.[10]

## II

■ At the outset, we are faced with the Government's contention that the appellees lack standing to challenge the FEIS discussions of alternatives to the proposed highway and the effect of construction on the Cuna and Choco Indians. The Government, however, has stated its belief that the appellees do have standing to challenge the FEIS with regard to the potential spread of aftosa.[11]

We agree that appellees have standing to challenge the adequacy of the FEIS based upon their concern that construction may result in the spread of aftosa into the United States.[12] In addition, we believe that the discussion of alternatives, which is specifically required by NEPA,[13] is merely an extension of the aftosa control discussion, especially since one alternative would be not to build the highway. We thus perceive no jurisdictional difficulty in exploring the adequacy of the FEIS discussion of alternatives.

The effect of the proposed highway on the Cuna and Choco Indians, however, presents a more difficult standing question.[14] Appellees have not alleged any spe-

to expend funds already appropriated, and to take other actions, for the purpose of carrying out . . . contracts already made as of the date of the issuance of the preliminary injunction . . . for construction of the portion of the Darien Gap Highway extending from Tocumen to Rio Canglon in the Republic of Panama . . . .

Record entry 25. The appellants filed a notice of appeal from this order, *id.* 26, but subsequently moved to dismiss their appeal, *id.* 27. The motion to dismiss the appeal was granted on March 23, 1976. *Id.* 28.

8. FEIS at 12.9.

9. Appendix (App.) at 33.

10. On August 10, 1977, a motions panel of this court modified the preliminary injunction "to the extent that appellant may seek further appropriations from Congress." The Govern-

ment has requested a $20 million supplemental appropriation for Fiscal Year 1978 and a $20 million appropriation for Fiscal Year 1979. *Budget of the United States Government, Fiscal Year 1979, Appendix* 682, 1037 (1978).

11. Brief for the Federal Appellants at 14–16.

12. We perceive no prudential considerations that would affect the appellees' standing in this regard. *See Realty Income Trust v. Eckerd,* 183 U.S.App.D.C. 426, 431–32, 564 F.2d 447, 452–53 & n.11 (1977).

13. 42 U.S.C. § 4332(2)(C)(iii) (1970).

14. The effect of construction on the Indians, as well as on flora and fauna, *see* note 42 *infra,* also brings into question the applicability of NEPA to United States foreign country projects

cific harm they will suffer as a result of inadequate discussion and consideration of this issue by the federal decisionmakers.[15] They argue, however, that, having established standing to challenge the adequacy of the FEIS on at least one ground, they are entitled to raise other inadequacies in the FEIS based upon the "public interest" in requiring government officials to discharge faithfully their statutory duties under NEPA.[16] We agree with this contention.

In its discussion of standing in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Supreme Court stated that

> the fact of . . . injury is what gives a person standing to seek judicial review under the statute [in question], but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate.

*Id.* at 737, 92 S.Ct. at 1367 (citing, in footnote 12, 3 K. Davis, Administrative Law Treatise §§ 22.05–.07 (1958)); *accord, Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ("so long

as this requirement [of alleging a distinct and palpable injury] is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, . . . may invoke the general public interest in support of their claim."); *see Scripps-Howard Radio, Inc. v. FCC,* 316 U.S. 4, 14–15, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 477, 60 S.Ct. 693, 84 L.Ed. 869 (1940). *See generally National Wildlife Federation v. Snow,* 182 U.S.App. D.C. 229, 239, 561 F.2d 227, 237 n.41 (1976); *Office of Communication of the United Church of Christ v. FCC,* 123 U.S.App.D.C. 328, 334–40, 359 F.2d 994, 1000–06 (1966). This public interest concept is particularly applicable to cases brought under NEPA and the Administrative Procedure Act, *see* 5 U.S.C. § 702 (1976).

NEPA is an "action-forcing" statute; it places the "primary and non-delegable" responsibility for compliance with its requirements on the agency, not the public. *See I-291 Why? Ass'n v. Burns,* 517 F.2d 1077, 1081 (2d Cir. 1975). Section 102(2)(C) of the statute, 42 U.S.C. § 4332(2)(C) (1970), which requires a "detailed statement" of the envi-

---

that produce entirely local environmental impacts, or, as in this case, some impacts that are strictly local and others that also affect the United States. At the direction of our motions panel, both parties submitted supplemental briefs on the question of the applicability of NEPA to construction in Panama. In its response, the Government stated that it "never questioned the applicability of NEPA to the construction of this highway in Panama . . .," but it also intimated that this position might not apply to "purely local concerns (Indians and alternate routes)." Appellees took the position that NEPA does apply to the construction "whether the impact of such construction may occur in the United States, in the countries of Central America, or in both."

In view of the conclusions that we reach in this case, we need only assume, without deciding, that NEPA is fully applicable to construction in Panama. We leave resolution of this important issue to another day. *See generally* 42 U.S.C. §§ 4321, 4331(a), 4331(b)(1)&(2), 4331(c), 4332(2)(A), 4332(2)(C), 4332(2)(F) (1970 & Supp. V 1975); 40 C.F.R. § 1500.-8(a)(3)(i) (1976); Council on Environmental Quality, *Memorandum to Heads of Agencies on Applying the EIS Requirement to Environmen-*

tal *Impacts Abroad,* Sept. 24, 1976; Note, *The Extraterritorial Scope of NEPA's Environmental Impact Statement Requirement,* 74 Mich.L. Rev. 349, 365 (1975); Washington Post, Jan. 30, 1978, § A, at 22, col. 1.

**15.** Appellee National Audubon Society (NAS) did allege injury to the interests of its members in the use and enjoyment of the Darien Gap area in its virgin state, App. at 7–8, Brief for Appellees at 34, but the discussion of the effect on Indian tribes has no bearing on this alleged injury. Appellees Sierra Club, NAS, and Friends of the Earth alleged that the Government's failure to prepare, circulate for comment, make available to the public, and consider an environmental impact statement adversely affected the dissemination of information and educational activities of their organizations. App. at 6–9; Brief for Appellees at 34; *see Scientists' Institute for Public Information v. AEC,* 156 U.S.App.D.C. 395, 402–03, 481 F.2d 1079, 1086–87 n.29 (1973). Since each of these actions has been accomplished, however, none can provide a basis for standing to challenge the FEIS discussion of Indian tribes.

**16.** Brief for Appellees at 30–35.

ronmental impacts of, and alternatives to, various federal actions, has been aptly described as "the heart of NEPA," combining, as it does, "the legislative objectives of full disclosure, consultation, and reasoned decisionmaking prescribed as the cutting edge of administrative reform." W. Rodgers, Environmental Law § 7.4, at 725 (1977). An interpretation that unnecessarily restricts the ability of plaintiffs properly before the court to challenge additional inadequacies in an environmental impact statement would be patently inconsistent with the unequivocal legislative intent embodied in NEPA that agencies comply with its requirements "to the fullest extent possible." 42 U.S.C. § 4332 (1970); see Realty Income Trust v. Eckerd, 183 U.S.App.D.C. 426, 431–32, 564 F.2d 447, 452–53 (1977). Furthermore, because of the statutory [17] and regulatory [18] requirements that the FEIS reflect an "inter-disciplinary" and "integrated" approach, the issues discussed in the statement will be necessarily interrelated and interdependent. A reviewing court will rarely view one issue in isolation, and its task will be aided by adversarial illumination of all critical portions of the statement. We hold, therefore, that, because appellees have established an independent basis for standing to challenge the FEIS, they also have standing to argue the public interest in support of their claim that there is inadequate discussion and consideration of the effect of the construction on the Cuna and Choco Indians.

### III

■ We turn now to the merits. Simply put, the issue before us is the adequacy of the FEIS in the three areas of discussion found deficient by the district court: 1) the control of aftosa; 2) alternatives to the proposed highway; and 3) the effect of the Cuna and Choco Indians.[19] Since there are no facts in dispute, ours will be an essentially de novo review, because this court is "in as good a position as the district court to determine . . . what could reasonably be demanded of the EIS in issue." County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1375 (2d Cir. 1977).

While the question of the proper scope of review by a court of the adequacy of an environmental impact statement is still open, Aberdeen & Rockfish Railroad v. Students Challenging Regulatory Agency Procedures (SCRAP), 422 U.S. 289, 326–27 n.28, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), the contours of this review are relatively well defined. We are governed by a "rule of reason," Carolina Environmental Study Group v. United States, 166 U.S.App.D.C. 416, 418, 510 F.2d 796, 798 (1975), and our task is "to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors," Sierra Club v. Morton, 510 F.2d 813, 819 (5th Cir. 1975). While we must require "full, fair, bona fide compliance with NEPA," Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir. 1974) (en banc), we are not to "fly speck" the statement, id., nor substitute our judgment for that of the agency, id.; Scenic Hudson Preservation Conference v. FPC, 453 F.2d 463, 468 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972) (citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). In this instance, we disagree with the district court's determination of inadequacy and hold that the FEIS meets the requirements of NEPA. We shall discuss each of the disputed topics shortly, but two remarks of general applicability are first in order.

In determining that the Government had complied with the procedural requirements of NEPA, the district court made only brief mention of the fact that such compliance included circulating the draft environmental impact statement for comment to over

---

17. See 42 U.S.C. §§ 4331(a), 4332(2)(A) (1970); S.Rep.No. 91–296, 91st Cong., 1st Sess. 20 (1969).

18. 40 C.F.R. § 1500.8(c) (1976); accord, 23 C.F.R. § 771.2 (1977).

19. See note 42 infra.

seventy government and outside agencies and individuals in the United States, Panama, and Colombia. Significantly, neither the Council on Environmental Quality (CEQ) nor the Environmental Protection Agency (EPA) objected to the draft statement, the latter remarking that the draft "adequately sets forth the environmental impact of the proposed action." [20] This fact is noteworthy because of the crucial roles of both CEQ and EPA in the environmental area. *See Aberdeen & Rockfish Railroad v. SCRAP*, 422 U.S. at 328, 95 S.Ct. 2336 (Douglas, J., dissenting). *See also Warm Springs Dam Task Force v. Gribble*, 417 U.S. 1301, 1304–10, 94 S.Ct. 2542, 41 L.Ed.2d 654 (Douglas, Circuit Justice, 1974); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 713, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (Douglas, J., dissenting in part).

■ Even more significant, however, is the manner in which the Government responded to the adverse comments it received on the draft statement. Comments that are included in a final environmental impact statement are to be regarded as an integral part of the statement, *National Helium Corp. v. Morton*, 486 F.2d 995, 1003 (10th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974), but their usefulness to the decisionmaker depends upon the extent to which they are addressed and incorporated by reference in the statement. *Sierra Club v. ICC*, No. 76–1557, slip op. at 14–15 (1978), *vacated and rehearing en banc granted, Apr. 4, 1978, petitioner's motion to dismiss petitions for review granted, May 8, 1978.* In this regard, the FEIS is far more than adequate. Each comment that merited further consideration was carefully indexed, and over fifty individual responses were made by the Government, most on a paragraph-by-paragraph basis.[21] Some of the comments were simply addressed by a short response, while most were incorporated into the FEIS. Most notably, counsel for appellees submitted eight pages of comments, and the Government included these pages and five pages of responses in the FEIS.[22] While the Government did not agree with all conclusions reached in the comments, there is no doubt that it gave full and fair consideration to each comment received. Thus, as we discuss the three subjects under scrutiny, we believe it fully warranted to refer to any discussion of them in the comments section of the FEIS.

### A. *Aftosa*

The effect that construction of the highway may have on the possible spread of aftosa into the United States is undoubtedly the most significant consideration addressed in the FEIS. It is important, however, to understand the manner in which this issue comes before us.

Although the district court's preliminary injunction applied to the entire length of the Darien Gap Highway, only that portion that bears upon construction of the Panamanian segment up to the Colombian border is of current import, since the Government does not intend to assist in construction in Colombia until the U.S. Department of Agriculture certifies that an effective aftosa control program is established in that country.[23] Thus, the aftosa problem in Colombia, admitted to be of epidemic proportion in some parts of the country,[24] is of present concern only to the extent that it affects construction of the Panamanian segment.

As the FEIS candidly admits, aftosa is one of the most dreaded domestic livestock diseases, and the Darien Gap has served as

---

**20.** FEIS at 12.1; *see id.* at iii.

**21.** *Id.* at 12.1–.17; *see* 40 C.F.R. §§ 1500.-2(b)(2)&(3), 1500.10(a) (1976); W. Rodgers, Environmental Law § 7.4, at 730 (1977).

**22.** FEIS at 12.9.

**23.** *Id.* at 6–17; Brief for the Federal Appellants at 7–8; *Budget of the United States Government, Fiscal Year 1979, Appendix* 632, 1037 (1978). *See also* note 43 *infra* & accompanying text.

**24.** FEIS at 4–32.

an effective natural land barrier to the spread of the disease.[25] However, it also points out that Panama maintains a very strict aftosa prevention program, even though Panama has no record of any aftosa cases.[26] In addition, a cooperative agreement on aftosa control has been entered into by the United States and Panama,[27] and numerous preventive measures have been taken, including the establishment of a forty-mile wide quarantine zone at the border and a series of inspection stations in this zone and westward.[28] Furthermore, if an outbreak were to occur, Panama has indicated it would close the Darien Gap Highway to control the spread of the disease.[29] In light of these factors, the FEIS concludes that the increased risk of an outbreak of aftosa in the United States due to construction of the Darien Gap Highway is insignificant.[30]

In reaching this conclusion, however, the FEIS does not conceal the possibility that an outbreak could occur, and the comments by a number of persons to that effect are included in the statement.[31] As noted above, the FEIS addresses each of these comments, and either includes a direct response in the comment section or incorporates the suggestion into the main body of the statement.

The statement also is quite frank about the extent of the Colombian aftosa problem, stating that the United States-Colombian program to control the disease still has a good distance to go before being fully effective.[32] However, the proposed highway construction has led to heightened concern about aftosa in Colombia, resulting in, among other measures, aftosa control zones

being established along the Panamanian border.[33] As mentioned at the outset of this section, however, the Colombian aftosa problem is significant at present only insofar as it affects the proposed construction on the Panamanian segment. In that regard, the FEIS notes that construction of the highway up to the Colombian border will serve the beneficial purpose of channelizing Colombian traffic to a common point of entry that can be effectively policed by Panamanian inspectors.[34]

In sum it is our belief that the aftosa discussion relative to construction of the Panamanian segment is adequate. It supplies in reasonable detail the information a decisionmaker would require to balance and to consider fully the environmental factors of a decision to proceed, and this is all that NEPA requires. *Sierra Club v. Morton*, 510 F.2d at 819; *see Concerned About Trident v. Rumsfeld*, 180 U.S.App.D.C. 345, 355, 555 F.2d 817, 827 (1977).

### B. *Alternatives*

We similarly believe that the FEIS discussion of alternatives is adequate. In conducting the inquiry that undergirds this conclusion, we are, of course, to apply a rule of reason. *National Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 10–11, 458 F.2d 827, 837–38 (1972).

■ The FEIS considers a wide range of alternatives to the proposed highway, both in Panama and in Colombia. In addition to a number of alternative highway routes, the FEIS also explores various "non-highway" alternatives and a "no action" alter-

---

25. *Id.* at 4–19 to 4–24.

26. *Id.* at 4–24.

27. *Id.* at 6–13, Appendices C & E.

28. *Id.* at 4–24 to 4–25 (including Figure 4.8), 6–13 to 6–14.

29. *Id.* at 6–14.

30. *Id.* at vi.

31. *See, e.g., id.* at 12.3, 12.9, & responses. These comments also bring to the attention of

the decisionmaker the fact that such an outbreak would be very expensive to control. *See id.* at 12.3 & responses.

32. *Id.* at 6–17. *But see id.* at 12.15, 12.17.

33. *Id.* at 6–17 to 6–21, including Figure 6.1; *see* Friends of the Earth, *Not Man Apart*, vol. 4, no. 18, at 5 (Mid-Dec. 1974).

34. *See id.* at 6–14, 12.4, 12.7, 12.9 & response 17.

native.[35] The discussions of these alternatives are somewhat brief,[36] but in view of the fact that Congress has authorized United States assistance in constructing a *highway*, after years of consideration by both the legislative and executive branches, we believe that these discussions are reasonable. While subsequent congressional action does not vitiate the need for an environmental impact statement or a discussion of alternatives (unless explicitly stated in the statute), such action does have a bearing on what is to be considered a reasonable alternative, and a reasonable discussion. *See Greene County Planning Board v. FPC*, 559 F.2d 1227, 1232–33 (2d Cir. 1976); *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 853 (8th Cir. 1973).

There is no dispute concerning the Panamanian highway alternatives, but appellees do press the district court's position that the discussion of the Colombian alternative route contains little environmental analysis.[37] We disagree, noting once again that the comments section of the FEIS contains supplementary discussion not mentioned by the district court.[38] When read as a whole, there is ample exposition, from an environmental standpoint, of the relative merits of both the chosen and alternative routes.

### C. *Cuna and Choco Indians*

The appellees also challenge the adequacy of the FEIS discussion of the impact of construction on the Cuna and Choco Indians who inhabit the area that the highway is expected to traverse. The district court also believed the discussion was inadequate, stating that the FEIS "makes no attempt at serious anthropological or ethnographic analysis of the impact of secondary development resulting from the highway upon these people." 421 F.Supp. at 66.

We emphatically reject the assertion by the Government that something less than a thorough discussion is required because the Indians represent only a small fraction of the Panamanian population,[39] especially since the Government's first environmental impact assessment indicated that the Indians faced possible cultural extinction, 421 F.Supp. at 66. Nevertheless, we do believe the FEIS discussion about the impact on the Indians is adequate.

The FEIS main body section on the Indians is one of its most detailed discussions.[40] In addition, extensive comments were received on this topic, and again the Government's response to the comments was more than adequate.[41] While there certainly will be a degree of cultural disruption on the Indians, the precise extent of this disruption is apparently subject to a wide variety of interpretations. Because the decision-maker was presented with the entire range of these interpretations, in sufficient detail to allow him to balance the appropriate environmental factors, we believe NEPA's requirements have been met.[42]

---

35. *Id.* at 7–1, 7–3, 7–5.

36. Again, however, the comments section supplements the main body discussion. *See id.* at 12.2, 12.4, 12.9.

37. *See* Brief for Appellee at 25. We see no reason to postpone consideration of the adequacy of the Colombian alternative routes discussion pending certification of an effective aftosa control program in that country, since it does not appear that the route selection in any way influences the establishment of the program. *See* FEIS at 7–3 to 7–5.

38. FEIS at 12.9 & responses.

39. *See* Brief for the Federal Appellants at 9.

40. FEIS at 6–27 to 6–31; *see id.* at 4–43 to 4–57.

41. *Id.* at 12.6, 12.9, 12.10, & responses.

42. At oral argument, counsel for the appellees resurrected the argument that the FEIS discussion of the effect of construction on flora and fauna in the region is inadequate. While this issue was addressed at the comment stage of the FEIS preparation, *see id.* at 12.9, it apparently was not in issue in the district court, nor was it briefed on appeal. As noted in the standing discussion above, one of the reasons we found persuasive in holding that appellees had standing to argue the public interest was that a reviewing court is aided by adversarial illumination of points in dispute. Although we have reviewed the flora and fauna discussion in this instance and find it to be adequate, *see id.* at 6–1 to 6–9, 6–15 to 6–17, 12.5, 12.9, 12.14; *Sierra Club v. ICC*, No. 76–1557, slip op. at 6–10 (D.C.Cir. Feb. 21, 1978), *vacated and re-*

## IV

In conclusion, we find that the FEIS adequately discusses the various issues of environmental concern, and hence complies with the requirements of NEPA. Accordingly, we vacate the preliminary injunction. However, because we have found evidence that indicates that the Government may be a bit too anxious to complete this project,[43] we remand this case to the district court with the instruction that the Department of Agriculture certification with regard to aftosa control in Colombia be filed with the district court and the appellees prior to the initiation of any construction in that country.

*Vacated and remanded.*

hearing en banc granted, Apr. 4, 1978, petitioner's motion to dismiss petitions for review granted, May 8, 1978, we expect that in the future such arguments, if important enough to merit full consideration by the court, will be made both in written briefs and at oral argument.

**43.** In its Fiscal Year 1979 budget request, the Government stated: "Construction [on the Darien Gap Highway] has been delayed for two construction seasons by the courts pending satisfactory completion of certain environmental requirements. *These requirements have been met . . . ." Budget of the United States Government, Fiscal Year 1979, Appendix* 1037 (1978) (emphasis added). The fact that this document was transmitted to Congress on *January 20, 1978*, after oral argument but before final decision in this case, leads us to continue judicial supervision of the project. While we recognize that oversights can occur in an undertaking as vast as preparing a $500 billion budget, we must also recall that vitally important environmental concerns are present in this case.