ATCHISON, TOPEKA AND SANTA FE
RAILWAY COMPANY et al.

v.

Clifford R. ALEXANDER et al.

The IZAAK WALTON LEAGUE OF
AMERICA et al.

v.

Clifford R. ALEXANDER et al.

Civ. A. Nos. 74–1190, 74–1191.

United States District Court,
District of Columbia.

Oct. 23, 1979.

See also, D.C., 480 F.Supp. 972.

Joseph V. Karaganis, Sanford R. Gail, Joseph D. Feeney, Stuart E. Vaughn, Chicago, Ill., Jon T. Brown, Washington, D. C., for plaintiffs.

Fred R. Disheroon, William Hill, Mark Sussman, Dept. of Justice, Washington, D. C., for defendants.

George V. Allen, Jr., Ramsay D. Potts, William P. Barr, Washington, D. C., for intervenor defendant Association for the Improvement of the Mississippi River.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. RICHEY, District Judge.

This case involves the legality of the United States Army Corps of Engineers' ("the Corps") efforts to add a new "step" in the "stairway of the Mississippi." The "stairway" is the series of dams and locks which descend from the headwaters of the Upper Mississippi River and which, together with dams and locks on the Illinois River, comprise the Upper Mississippi River Navigation System; the "step" is Lock and Dam 26, a new dam and a new 1200-foot lock proposed for construction at Alton, Illinois.[1] This structure will replace the present edifice which consists of a dam and two smaller locks. It will stand at the crossroads of the entire Inland Waterways System and serve as the gateway to America's breadbasket.

Plaintiffs, a conglomeration of eighteen midwestern railroads[2] and three environmental groups,[3] assert that further consideration of the Lock and Dam 26 proposal must be halted until defendants[4] have ful-

---

1. A map of the entire Inland Waterways System appears as Exhibit A to this opinion. This map was taken from volume 1 of the Draft Supplemental Impact Statement at figure 1–1 (Defendants Exhibit 46). A similar map appears at 382 F.Supp. 610, 613 (D.D.C.1974). Other published opinions appear at 431 F.Supp. 722 (1977) & 459 F.Supp. 188 (1978).

2. The plaintiffs in Civil Action No. 74–1190 are: The Atchison, Topeka and Santa Fe Railway Company; Burlington Northern, Inc.; The Chicago, and North Western Transportation Company; Stanley E. G. Hillman as Trustee of the property of Chicago, Milwaukee, St. Paul and Pacific Railroad Company; William M. Gibbons as Trustee of the Property of Chicago, Rock Island and Pacific Railroad Company; The Denver and Rio Grande Western Railroad Company; Elgin, Joliet and Eastern Railway Company; Illinois Central Gulf Railroad Company, the Kansas City Southern Railway Company; Missouri-Kansas-Texas Railroad Company; Missouri Pacific Railroad Company; Norfolk and Western Railway Company; St. Louis Southwestern Railway Company; St. Louis-San Francisco Railway Company; Soo Line Railroad Company; Southern Pacific Transportation Company; Toledo, Peoria & Western Railroad Company; and Union Pacific Railroad Company.

3. The plaintiffs in Civil Action No. 74–1191 are: The Izaak Walton League of America, The Sierra Club, and The Izaak Walton League of America, Illinois Division.

4. The defendants in both civil actions are: Clifford R. Alexander, Secretary of the Army; The United States Army Corps of Engineers ("the Corps"); and Major General John W. Morris,

filled their legal obligations. In essence, plaintiffs allege that defendants have failed to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4331–4347, ("NEPA"), and with their own regulations. The common denominator of plaintiffs' claims is that defendants have acted arbitrarily and capriciously in preparing an environmental impact statement ("EIS"), in selecting a recommended plan, and in deciding to go forward with the proposal. After a review of the evidence presented at a five-day trial, the Court finds that defendants have, to date, not acted arbitrarily or capriciously in the Lock and Dam 26 matter, except with respect to their own regulations. The Court is persuaded that defendants have neglected to conduct a public meeting, pursuant to Corps regulations. Accordingly, the Court shall issue a declaratory judgment to that effect, but it shall deny plaintiffs' petition for injunctive relief.

## I. BACKGROUND

The history of this case largely concerns the parties' activities in two forums. First, in the courthouse, legal questions were resolved so as to require a trial, and the record of the Court's activity is vital to an understanding of the issues presented by the parties. Second, in the Corps' offices, the documents which rest at the heart of this suit were prepared and issued to the public; familiarity with these documents is equally vital to an understanding of the issues tried. The Court will briefly summarize the record of the parties' efforts in these forums, providing further background details where appropriate.

### A. *The Course of This Litigation.*

Commercial navigation on the Upper Mississippi River and the Illinois River is made possible through a series of locks and dams known as the Upper Mississippi River Navigation System. The dams in this system control the depth and flow of the rivers, thereby assuring tow barges of navigable waters; the locks, by filling and emptying with water, carry tows, and other craft, up and down the stairway of water formed by the dams. Presently, on the Upper Mississippi River the waterways system consists of a series of twenty-seven locks and dams, extending from St. Paul, Minnesota to a point just south of the mouth of the Missouri River; on the Illinois River, there are seven locks and dams, from Lockport, Illinois to LaGrange, Illinois. Plaintiffs' complaint concerns perhaps the most vital link in this impressive series of structures—the passageway to both the Illinois and Upper Mississippi Rivers. Just fifteen miles south of the juncture of these rivers (and eight miles north of the mouth of the Missouri River) stands Locks and Dam 26. All waterborne commerce shipped between the Upper Mississippi River Navigation System, and the Ohio River, the Lower Mississippi River and the Gulf Intracoastal Waterway must pass through these two locks. Locks and Dam 26, as it now stands, consists of a main lock, which is 600 feet by 110 feet, and an auxiliary lock, 300 feet by 110 feet. Complaining of both the soundness of the dam and the capability of the locks to efficiently handle increasing barge traffic, the Corps has, for the last eleven years, sought to cure these alleged defects by constructing a new lock and dam. Now, with the authorization of Congress, see Act of October 21, 1978, Pub.L. No. 95–502, 92 Stat. 1693 ("Public Law No. 95–502"), the Corps plans to replace this entire structure with a new dam and a single 1200-foot lock located two miles downstream. A brief account of this decade-long effort is helpful to an understanding of this Court's prior decisions.

The replacement project sought by the Corps was originally recommended in 1968 by the St. Louis District Engineer; this recommendation was for a new dam· and two 1200-foot locks two miles downstream of the present structure. A year later, the Board of Engineers for Rivers and Harbors recommended immediate implementation of the plan. The Secretary of the Army, acting according to his perceived authority under section 6 of the Rivers and Harbors Act

Chief of Engineers, Department of the Army. There is also an intervenor-defendant, the Association for the Improvement of the Mississippi River.

of 1909, 33 U.S.C. § 5, approved the project and, in fiscal year 1970, Congress appropriated funds for the design of the project.

On August 6, 1974, three environmental organizations and a host of midwestern railroads filed separate suits in this Court seeking to prevent the initiation of construction on the two-lock project. That same day, Judge Corcoran issued a temporary restraining order prohibiting the letting of bids for the proposed Locks and Dam 26. One month later, this Court issued a preliminary injunction halting all further activity on the project. *Atchison, Topeka and Santa Fe Railway Co. v. Callaway*, 382 F.Supp. 610 (D.D.C.1974). In issuing the injunction, the Court ruled that the proposed locks and dam were a new structure, rather than a rebuilt one, and as a result, congressional authorization under Section 9 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401, was a prerequisite to the commencement of the Corps' work. *Id.* at 616–61F. The Court found a likelihood that plaintiffs' would prevail on their claim that defendants had violated NEPA by not preparing a detailed statement which adequately discussed the systemic impact of the two-lock proposal and reasonable alternatives to the plan. *Id.* at 620–623.

After issuance of the injunction, the Corps restudied the original proposal for Locks and Dam 26 and decided to comply with the Court's decree. In August, 1975, the District Engineer in St. Louis, after preparing a draft supplemental EIS and updating the Corps' economic analysis, recommended a project identical in scope to the original plan. The Board of Engineers for Rivers and Harbors,[5] however, reviewed this proposal and recommended limiting its scope to a new dam and a single 110-foot by 1200-foot main lock, with provisions for adding a second lock after gathering certain environmental and economic data. In March, 1976, the Chief of Engineers issued his report to the Secretary of the Army substantially adopting the Board's recommendations. Upon receipt of the Chief's recommendation, the Secretary of the Army terminated his approval of the pending two-lock proposal. Finally, on August 4, 1976, the Secretary formally recommended to Congress that it authorize the construction of a replacement dam and 1200-foot lock and that it not authorize a second lock until an interagency study indicated that one should be constructed. "Letter of Transmittal," Final EIS at v. A proposed bill and a final environmental impact statement accompanied the Secretary's recommendation.

While Congress took up consideration of the Secretary's proposal, the parties renewed their efforts in this Court. In an opinion dated May 2, 1977, the Court found that the Secretary's withdrawal of approval from the Locks and Dam 26 project removed the possibility of harm to plaintiffs; accordingly, it dissolved the outstanding injunction. *Atchison, Topeka and Santa Fe Railway Co. v. Callaway*, 431 F.Supp. 722, 725 (D.D.C.1977). The Court also reviewed plaintiffs' standing to seek relief while congressional action on the new project was pending. First, the Court recognized a private right of action to enforce the requirement established in section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), that an EIS accompany proposals for legislative action. *Id.* at 725–729. Second, it held that plaintiffs possessed standing to enforce this right and that their claims presented a justiciable case. *Id.* at 729–730. Later, the Court directed the parties to address the issue of the proposal before Congress; on November 29, 1977, the Court found that there remained before Congress a "proposal for legislation" by the executive branch with respect to Lock and Dam 26. Thus, the stage was set for continued litigation.

---

5. The Board of Engineers for Rivers and Harbors ("BERH") was established by Congress in section 3 of the Rivers and Harbors Act of 1902, 33 U.S.C. § 541. BERH provides an independent review of all survey reports for navigation, flood control and related purposes made in response to acts of Congress and resolutions of congressional Public Works Committees. It submits reports containing conclusions and recommendations on these proposed projects to the Chief of Engineers.

The parties' cross-motions for summary judgment were the next matters for judicial review. Plaintiffs' motion sought a declaratory judgment that the Corps' Final EIS failed to comply with NEPA and that defendants' decision to propose legislation for the new project was arbitrary and capricious in light of the project's "true" costs and benefits. The Court denied plaintiffs' motion because it found material facts in dispute regarding the systemic impact of the project, the Corps' calculation of costs and benefits, and several other matters. *Atchison, Topeka and Santa Fe Railway v. Callaway*, 459 F.Supp. 188, 190–192 (D.D.C. 1978). The Court also held that under NEPA, an evidentiary hearing was appropriate to assess the sufficiency of an environmental impact statement. Thus, review of the Final EIS could not be limited by the content of the administrative record. *Id.* at 192–193. Finally, the Court granted defendants' motion to dismiss plaintiffs' claims seeking to enjoin the proposal of authorizing legislation. *Id.*

While the Court was reviewing the legal merits of the parties' contentions, Congress was deliberating the merits of the Secretary's proposal. During the Spring and Summer of 1977, hearings were conducted before the appropriate committees in the House and Senate and the merits of the project were debated on the floor of Congress. *See* S.Rep.No.95–215, 95th Cong., 1st Sess. (1977); H.R.Rep.No.95–545 pt. 1, 95th Cong., 1st Sess. (1977); 124 Cong.Rec. S18,043–052 (daily ed. Oct. 23, 1978); *id.* H12,695–701; *Proposed Waterway User Charges and Replacement of Locks and Dam 26: Hearings on S. 712, S. 790 & S. 923 Before the Subcomm. on Water Resources of the Senate Comm. on Environment and Public Works*, 95th Cong., 1st Sess. (1977); *Replacement of Locks and Dam 26 at Alton, Illinois: Hearings Before the Subcomm. on Water Resources of The House Comm. on Public Works and Transportation*, 95th Cong., 1st Sess. (1977);

*Locks and Dam 26: Hearings on S. 1285, S. 3425 & S. 3506 Before the Subcomm. on Water Resources of the Senate Comm. on Public Works*, 94th Cong., 2d Sess. (1976).

On October 21, 1978, President Carter approved H.R.8533, 95th Cong., 2d Sess. (1978), thereby authorizing the replacement of Locks and Dam 26 with a new dam and 1200-foot lock located two miles downstream from the existing structure; the replacement would cost approximately $421 million. Act of October 21, 1978, Pub.L. No. 95–502, § 102(a), 92 Stat. 1695. The new law also instructed the Upper Mississippi River Basin Commission[6] to "prepare a comprehensive master plan for the management of the Upper Mississippi River System"; moreover, the law proscribed any "replacement, construction, or rehabilitation" which expands the navigation capacity of the existing locks, dams and channels until the Commission's master plan has been approved by Congress. *Id.*, §§ 101(a) & (i), 92 Stat. 1693 & 1695. In addition, the Act also expressly limited the navigation depth of the channels in the system to nine feet, except where specifically authorized by Congress. *Id.* § 102(c), 92 Stat. 1695. Thus, having obtained the approval of Congress, the Corps had at last complied with the mandate of 33 U.S.C. § 401, as construed by this Court's original decision in the case. *See* 382 F.Supp. at 616–61F.

Plaintiffs responded to the legislation by promptly filing an amended complaint. The Court, in turn, instructed the parties to submit memoranda of law on the effect of Public Law No. 95–502. Defendants moved for summary judgment contending that plaintiffs' NEPA claims had been definitively resolved by Congress. The Court denied this motion, finding that the new law had not repealed NEPA, either by implication or by its express terms. First, because NEPA was essentially a full disclosure law, it served *both* the public's and the legislature's need for information; this public in-

---

6. The Upper Mississippi River Basin Commission ("UMRBC") was established by Executive Order No. 11659, 37 Fed.Reg. 6047 (1972), pursuant to the power vested in the President by

42 U.S.C. § 1962b. The Commission serves as the principal agency for the coordination of the development of water resources in its area.

terest compelled the continued acknowledgment of a private right of action, even after Congress had passed authorizing legislation. Second, the Court found that the legislative history underlying Public Law No. 95–502 indicated that Congress neither intended its authorization to resolve the adequacy of the Final EIS under NEPA, nor viewed enactment as a reflection of its opinion on that issue. 480 F.Supp. 975 (D.D.C. 1979).

On the eve of trial, defendants renewed, in a limited fashion, some of the matters discussed in the Order of March 16, 1979. Specifically, defendants sought a ruling on the legitimacy of plaintiffs' claims under the Water Resources Planning Act of 1965, 42 U.S.C. §§ 1962 et seq., the regulations promulgated pursuant to that Act, 33 C.F.R. pts. 290–295 (1978), and several other statutes and regulations.[7] In ruling on this motion, the Court essentially found that Congress intended NEPA to serve a much broader purpose than the other statutes upon which plaintiffs based their claims. While the Water Resources Planning Act of 1965 and the River and Harbor Act of 1970 were both intended primarily to assist congressional review, NEPA was designed to aid legislative as well as public review. Hence, the Court concluded that a private right of action to enforce compliance with NEPA survived congressional authorization; yet, once Congress had spoken, claims under other statutes could be extinguished. Accordingly, the Court limited the case to plaintiffs' claims under NEPA and under defendants' post-authorization regulations. 480 F.Supp. 972 (D.D.C. 1979). The issues having been narrowed, the case was at last ready for trial.

Before discussing the trial, one final point must be clarified. Confusion regarding the import of the Court's September 10, 1979

Order 480 F.Supp. 972 arose out of the parties' differences over the precise definition of the decision under review.[8] Plaintiffs evidently assumed defendants' post-authorization decision to build, see part III infra, was still subject to review to determine compliance with the same substantive regulations which were held not to be a basis for review of a legislatively approved proposal. Plaintiffs, however, have neither suggested, nor proven, see part VG infra, the occurrence of any material change in the eleven months since authorization by Congress. Under such circumstances, it would be pure legerdemain for the Court to review as a "post-authorization agency decision" the same matters which it has held beyond its review as a result of legislative action before the agency decision. Accordingly, the Court has not reviewed plaintiffs' claim that defendants' post-authorization decision to build violates the Corps' substantive cost/benefit regulations, 33 C.F.R. pts. 290–295. The Court finds, as a matter of fact, that there have been no material changes in circumstance since Congress acted and it holds, as a matter of law, that absent such changes, a valid claim has not been stated.

### B. The Work of the Corps.

In response to this Court's decision in 1974, the Corps renewed its efforts to comply with NEPA and, in the process, created a host of documents. The Court provides the following chronology of these documents.

In June, 1975, the Corps issued a four-volume Draft Supplemental Environmental Impact Statement ("DSEIS") (Defendants Exhibit—hereinafter "DX"—46) and a three-volume Formulation Evaluation Report ("FER"), also referred to as "Design Memorandum No. 11" ("DM No. 11") (DX

---

**7.** In rejecting plaintiffs' claims under the Water Resources Planning Act of 1965, 42 U.S.C. §§ 1962 et seq., and the regulations enacted pursuant to that statute, the Court relied upon the intent of Congress to provide guidelines primarily for its own benefit. Thus, once Congress had authorized a particular project, it would be improper for a court to intervene and compel compliance, absent proof of a change in post-authorization circumstances. Indeed, sec-

tion 3 of the Act, 42 U.S.C. § 1962–1(a), provides, "Nothing in this chapter shall be construed— . . . to limit the authority of Congress to authorize and fund projects."

**8.** See part III, infra. The parties disputed whether the decision was administrative or legislative. The Court finds that it is essentially an administrative decision.

43). Both of these documents evaluated and recommended *two* 1200-foot locks and a new dam at the same location as the present proposal. The FER, however, included an economic evaluation of a single 1200-foot lock. *See* FER, vol. 1, at table 8–7, pages 8–9 (DX 43). After public hearings were held and further data collected, the Corps' St. Louis District published a Revised Draft Supplemental Environmental Impact Statement ("RDSEIS") (DX 47). One month later, the Board of Engineers for Rivers and Harbors issued its report ("BERH report") (DX 58) which evaluated the situation and recommended, for the first time, the current one-lock project. The Corps' Chief of Engineers adopted the Board's proposal when, in March, 1976, he completed a Draft Environmental Impact Statement ("DEIS") (Plaintiffs Exhibit— hereinafter "PX"—528). Finally, in July, 1976, the Corps published a two-volume Final Environmental Impact Statement ("FEIS") (DX 48) which analyzed the proposal for a single 1200-foot lock and a new dam. The FEIS incorporates by reference the RDSEIS, the FER and a final EIS issued in 1974. FEIS at 1. The Court must determine whether this FEIS conforms to the standards established by NEPA.

After publication of the FEIS, the Corps issued two other documents which are critical to this proceeding. First, in January, 1977, it published the Supplemental Economic Data, parts I and II ("SED") (DX 59). The SED basically updates the FER with data provided by research initiated in response to comments upon the FER. Second, on May 17, 1979, the St. Louis District of the Corps issued a document entitled Supplement No. 2 to Design Memorandum No. 2, General Design Memorandum ("GDM Supp. No. 2") (DX 61); this publication was intended to satisfy the requirements of the Corps' post-authorization regulations.

## II. THE TRIAL

On September 10, 1979, the Court commenced a five-day trial. As further background to its findings of fact and conclusions of law, the Court provides the following summary of the issues tried and the evidence presented.

### A. *Issues.*

At trial, this Court was confronted with two basic issues: 1) whether defendants complied with NEPA, and 2) whether defendants complied with their post-authorization regulations. The resolution of each of these issues requires an analysis of numerous matters.

The question of the meaning and significance of defendants' post-authorization regulations are matters of vital importance. Plaintiffs' case in chief, at its heart, rests on the assumption that there exists a post-authorization decision by the Corps of Engineers to build or not to build the approved project. Plaintiffs believe that this is the decision which the Court must review. Defendants assert that the final decision on the project was made by Congress and the Chief Executive in Public Law No. 95–502, § 102(a), 92 Stat. 1695 (1978). Thus, at the outset, this Court must determine whether the Corps ever made a decision to build the new lock and dam.

Assuming the existence of an agency decision subject to judicial review, plaintiffs allege both procedural and substantive defects in the decision-making process. First, defendants' failure to conduct a public meeting, with due notice for public comment, is alleged to violate the Corps' own regulations. Second, defendants' omission of certain "losses" from its cost/benefits analysis is alleged to violate the substantive requirements of the Corps' regulations. The neglected "losses" are: 1) the future costs of maintaining the entire Upper Mississippi Navigation System; 2) the projected losses to railroads which compete directly with river users; 3) the losses resulting from delays at upstream locks; and 4) the systemic environmental damage caused by increased use of the two rivers. For the reasons set forth in the concluding paragraph of part IA *supra*, the Court will not review this second allegation. *See also* part VG *infra*.

With respect to the question of defendants' compliance with NEPA, plaintiffs contend, *inter alia*, that the record is inadequate for judicial review, that three current proposals were not treated in the FEIS, and that several alternatives did not receive adequate consideration. Specifically, plaintiffs submit that the record is inadequate because defendants have relied upon "secret" data. Plaintiffs further argue that the FEIS should analyze the systemic impact of expanding the capacity of upstream locks, and also evaluate the environmental effects of alleged proposals to construct duplicate locks at certain dams along the Illinois River and to dredge a twelve-foot channel. Three alternatives to the proposed project, plaintiffs also submit, were inadequately evaluated; these possibilities are: 1) low-cost rehabilitation of the present structure; 2) investment in alternative transportation modes; and 3) more efficient methods of congestion control. Plaintiffs' environmental concerns center around defendants' purported failure to properly investigate the upstream biological impacts of the varying tonnages which move, or are projected to move, through the proposed lock and dam. Finally, plaintiffs argue that defendants' substantive decision regarding the costs and benefits of Lock and Dam 26 is arbitrary, capricious and in violation of section 101(b) of NEPA, 42 U.S.C. § 4331(b), because they neglected to weigh three factors: 1) system-wide maintenance costs; 2) revenue losses to railroads; and 3) alleged growth in traffic on the Illinois River.

B. *The Evidence Offered at Trial.*

At trial, plaintiffs presented their case through six expert witnesses, excerpts of depositions and hundreds of documentary exhibits. The plaintiffs' experts served not merely as conduits for the facts contained in the voluminous exhibits, but also as exponents of the conclusions which plaintiffs sought to have the Court draw from those facts.

Robert Haveman, a Professor of Economics at the University of Wisconsin-Madison, testified that review of the Corps' calcula-

tions was marred by non-disclosure of supposedly "secret" data. Dr. Haveman also stated that the Corps had failed to assess the systemic impacts of the proposed project. Relying solely on Corps statistics, he indicated that the Illinois River locks lacked the capacity to handle the increased traffic put through a 1200-foot lock at Alton and that this increase would lead to congestion and delay losses on the Illinois. As a result of this congestion, Dr. Haveman concluded that traffic would shift to the Mississippi River, causing congestion there and increasing the pressure to expand the locks on that river. He also noted that the Corps had neglected to evaluate the environmental impacts of either congestion on the Illinois or the shift in traffic to the Mississippi. Finally, Dr. Haveman stated that his findings indicated that costs for the project outweighed benefits. Plaintiffs' second expert, Dr. Joseph Carroll, a transportation economist with the Pennsylvania Transportation Institute, reiterated Dr. Haveman's testimony. He stated that, here, an analysis of *all* traffic—internal as well as Lock and Dam 26—on the Illinois was necessary to determine the impact of the project. He also testified that tonnage passing through Lock and Dam 26 would increase beyond Corps estimates due to larger tows.

Two biological experts, Drs. Thomas Claflin and Richard Sparks, speculated on the potential impact of tows on the ecology of the two rivers. Dr. Claflin, a Professor of Biology and Director of the River Studies Center, explained the project's environmental impact upon the Upper Mississippi River. He stated that the river was a fragile ecosystem and that a very slight change could conceivably trigger events leading to eutrophication. Much of his testimony was dedicated to explaining the multitude of ways that the passage of a tow could potentially alter the surrounding ecosystem. Dr. Sparks focused his analysis on the Illinois River and reiterated the conclusions of his colleague.

Plaintiffs also presented an engineering expert, Mr. William A. Wahler. His testi-

mony concerned the soundness of the present structure and the various low-cost methods of rehabilitating it. Mr. Wahler also attacked the accuracy of the Corps' safety analysis. Finally, Mr. John W. Ingram, President of Chicago, Rock Island and Pacific Railroad Company, testified regarding the projects' impact on midwestern railroads and, in particular, on his railroad. Mr. Ingram opined that construction of the new lock and dam could lead to the liquidation of the Chicago, Rock Island.

Throughout the testimony of these experts, their opinions and conclusions were regularly compared to the contents of the FEIS and to defendants' post-authorization regulations. In this manner, the alleged shortcomings of the Corps' work were presented to the Court.

Defendants responded by calling four witnesses to the stand. Colonel Leon McKinney, who had been District Engineer of the St. Louis District prior to his retirement in January, 1979, was one of the individuals responsible for supervising the preparation of the Lock and Dam 26 proposal. He testified regarding the inadequacy of the existing structures, the need for their replacement and, on cross-examination, the Corps' pre- and post-authorization procedures. Mr. Homer B. Willis, former Chief of the Engineering Division for the Civil Works Director in the Corps' Chief of Engineers Office, explained the engineering aspects of the FEIS. Dr. Daryl Simons, a river mechanics expert with the Engineering Research Center at Colorado State University, testified regarding the physical movement of sediment into backwater areas. His testimony did not touch upon the biological impact of that sediment. Finally, Mr. Robert M. Daniel, Chief Economist in the St. Louis District, explained the economic aspects of the Corps' work. Together, defendants' experts sought to rebut plaintiffs' allegations and to argue on behalf of the soundness of both the FEIS and the Corps' course of conduct.

## III. THERE EXISTS A POST–AUTHORIZATION ADMINISTRATIVE DECISION SUBJECT TO JUDICIAL REVIEW

█ Before discussing either plaintiffs' allegations, or the law which the Court must apply, it is imperative to define the nature of the decision which the Court must review. Is the decision at issue legislative or administrative? The Court finds that the decision is essentially administrative. The Court is persuaded first, that under prevailing Corps procedure, there exists a final decision on the merits of a particular project, even after Congress has authorized construction, and second, that such a decision was made regarding Lock and Dam 26. It is this decision—not that of Congress—which the Court must review.[9]

The Corps' regulations clearly provide for careful post-authorization analysis of a specific project to determine its adequacy under NEPA and other statutes. See Engineering Regulation (hereinafter "ER") 1110-2-1150 (PX 604); 33 C.F.R. §§ 209.-410(g)(1), (n)(ii) & (p)(3), & .405(f)(5) (1978). Such study would certainly be otiose if the Corps lacked authority to determine whether or not to go forward with construction. Moreover, part 257 of title 33, C.F.R., expressly delegates authority to division engineers to approve post-authorization documents which must be completed before a project may go forward. 33 C.F.R. § 257.4 (1978). This approval is tantamount to a final decision on the merits of a project and if approval may be given, it may also be denied. All testimony from Corps officials confirmed the plain import of these regulations. Both Colonel Leon McKinney, the District Engineer in St. Louis, and Mr. Edward Cohn, a Corps' official, tendered pursuant to Fed.R.Civ.P. 30(b)(6), testified that after authorization the Corps of Engineers not only analyzed the desirability of a project, but also retained the authority to declare a project unsuitable. McKinney

---

9. Although the decision under review may be administrative, the activity of the legislature has also been considered. See part IA supra.

Deposition (hereinafter "Dep.") at 21–29 & 48–49; Cohn Dep. at *passim*. Indeed, Mr. Cohn even conceded that there were projects within the Corps that had been authorized, but which the Corps had decided should not be constructed. Cohn Dep. at 68–69, 74 & 142–143.

Of course, congressional authorization to construct a 1200-foot lock and a new dam may not be construed as authorization to go forward with a different project. The evidence, however, shows that the Corps does retain authority to reassess, modify and, on occasion, stay a project which the legislature has approved. The Court finds that the Corps possessed this authority with respect to Lock and Dam 26, and that it exercised its decision to go forward with this project sometime after the issuance of the post-authorization study, GDM Supp. No. 2, in May, 1979. Finally, the Court holds that this decision is "final agency action" within the meaning of 5 U.S.C. § 704, and, therefore, subject to judicial review pursuant to 5 U.S.C. § 706.

Thus, there are two matters before the Court: first, whether the FEIS upon which defendants relied in deciding to go forward with construction complies with NEPA (counts III, VIII and X of the Amended Complaint) and second, whether the Corps' final decision to build complies with its own regulations as well as 5 U.S.C. § 706 (counts XI and XII). Because a post-authorization decision is under review, the Court must examine the adequacy of the FEIS at the time that that decision was made, rather than when the document was submitted to Congress. Only the *present* adequacy of the FEIS is at issue.[10]

## IV. STANDARDS OF REVIEW

Having established the precise nature of the matters under review, the Court shall briefly summarize the standards which it must apply in examining plaintiffs' allegations. Where a particular claim requires a variation from these general standards, that variation will be discussed in the relevant findings of fact.

### A. The National Environmental Policy Act.

■ NEPA is designed to foster the maintenance of "conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). The law reflects a legislative recognition of the principle that "each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." *Id.* § 4331(c). To achieve these goals, NEPA requires that every proposal for legislation, or other major federal action which significantly affects the human environment, be accompanied by a statement detailing the environmental impact of the proposed action, alternatives to the proposal, and the resources which would be irreversibly committed by the project. *Id.* § 4332(2)(C). This detailed statement, called an environmental impact statement ("EIS"), is intended to fulfill the legislative objectives of full disclosure and consultation. Moreover, it serves as the foundation for a careful and informed consideration of environmental values. *Calvert Cliffs Coordinating Committee v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

■ In reviewing an EIS, trial courts must apply a "rule of reason." *Carolina Environmental Study Group v. United*

---

10. In the months following congressional authorization and the filing of plaintiffs' Amended Complaint, there was much debate among the parties regarding the Court's power to review the FEIS. In two orders dated March 16, 1979, and September 10, 1979, this Court held that it possessed the authority to review the FEIS because legislative authorization could not be construed as approval under NEPA. At the time the Court rendered these decisions, the precise nature of the decision-making process

was a matter of dispute. By holding here that the final decision is indeed made by the Corps, the Court recognizes the change, from its prior orders, in the decision subject to review under NEPA. Instead of examining a congressional decision, the Court is now examining one by the Corps. The Court's prior opinions, however, remain vitally relevant: absent a reviewable congressional decision, the Corps' later decision might well be insulated from judicial scrutiny. *See* part IA *supra*.

*States*, 166 U.S.App.D.C. 416, 418, 510 F.2d 796, 798 (1975). The Court must determine whether the EIS has been prepared with objective good faith, and whether the final document set forth sufficient data to enable the decision-maker to fully consider environmental factors, and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action. *Sierra Club v. Adams*, 188 U.S.App.D.C. 147, 151, 578 F.2d 389, 393 (1978); *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). The law requires the Court to demand compliance "to the fullest extent possible." 42 U.S.C. § 4331. The Court, however, should not substitute its judgment for that of the agency and attempt to resolve conflicting scientific opinions. *County of Suffolk v. Secretary of Interior, supra*, at 1383. So long as the agency's conclusions have a "substantial basis in fact" and its EIS sets forth responsible opposing views, the mandate of NEPA has been satisfied. *Id.*

■ In the instant case, the agency decision which must be reviewed under NEPA is also a "final agency action" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. Thus, NEPA review is intertwined with review under the APA and defendants must comply with both statutes. These laws, however, foster similar goals—the assurance of an open and reasoned decision-making process. Under the APA, judicial review must "be based on the full administrative record that was before the [decision-maker] at the time of his decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). Because NEPA cases do not involve formal fact-finding, the precise content of the administrative record may be unclear. This Court believes that, at the very least, the record must contain all relevant studies and data used or published in compiling the statement; absent this material, a trial judge would be unable to review thoroughly the agency's conduct. In sum, under the APA as well as NEPA, the agency must "disclose the contents of what is relied upon or, in the case of publicly available information, specify what is involved in sufficient detail to allow for meaningful adversarial comment and judicial review." *United States Lines v. FMC*, 189 U.S.App.D.C. 361, 377, 584 F.2d 519, 535 (D.C.Cir. 1978); *see* W. Rodgers, *Environmental Law* § 7.4, at 727 (1977).

■ The reasoned decision-making required by these two laws also imposes obligations regarding the timeliness of the data upon which the agency relies. Although the agency's obligation to perform research and experiments necessary to gather new data is governed by NEPA's "rule of reason," *see County of Suffolk v. Secretary of Interior, supra*, at 1378, the agency must not disregard current data which is already in existence. As the court of appeals for this circuit has explained, an agency may not "shut its eyes to the events of the recent past" and rely on outdated information. *Seatrain International, S.A. v. FMC*, 194 U.S.App.D.C. 370, 374, 598 F.2d 289, 293 (D.C.Cir. 1979).

### B. *Corps Regulations.*

The Corps' post-authorization regulations appear in ER 1110–2–1150 (PX 604, ER 1105–2–507 (PX 603), and in two parts of title 33, C.F.R., which codify the ERs. Substantive review guidelines may be found at 33 C.F.R. pts. 290–295 (1978). These regulations are used by the Corps during the pre-authorization phase, first to determine whether to recommend a project, and then later, to determine whether to go forward with building. In the post-authorization phase, these five parts of title 33 establish a methodology for analyzing costs and benefits; they also call for publication of that analysis in a document known as a "General Design Memorandum" ("GDM"). This GDM is the Corps' ultimate decision-making document. The EIS is used as an impact analysis which provides input into the decision-making process surrounding the GDM; it is not, by itself, a decision-making document.

Regulations governing the Corps' administrative procedure appear at part 209 of title 33, C.F.R. Section 209.410 establishes rules for the preparation of EISs during the pre- and post-authorization phases. These rules clarify, and elaborate upon, ER 1105–2–507 and upon relevant parts of ER 1110–2–1150.

■ For two reasons, this Court is persuaded that, as a matter of law, defendants are bound by the regulations which they have published in the Code of Federal Regulations. In *NRDC v. Callaway*, 524 F.2d 79 (2d Cir. 1975), the Second Circuit reviewed a claim that the Corps had violated its own regulations by illegally issuing a dumping permit to the United States Navy. Although the only extant Corps regulations did not govern the inland waters where the Navy had been dumping, the Corps had made specific reference to its ocean dumping guidelines in issuing the inland waters permit. The Second Circuit ruled:

> Having relied at least in part upon the standards of the Ocean Dumping Criteria to support its selection of the [inland waters] site, the Corps cannot now be heard to say that those standards are irrelevant to its issuance of the permit for this dumping project. By its own use of the standards it has made them applicable to this case. The federal courts therefore have the power and the duty to review the application of the Criteria to the extent that they were used by the Corps.

*Id.* at 85. Defendants have similarly relied upon their regulations in this case. Moreover, other courts have looked to the Corps' NEPA regulations, 33 C.F.R. § 209.410 (1978), in assessing Corps activity. *See Save the Dunes Council v. Alexander*, 584 F.2d 158, 164 (7th Cir. 1978); *Conservation Counsel of North Carolina v. Costanzo*, 398 F.Supp. 653, 672 (E.D.N.C.), *aff'd*, 528 F.2d 250 (4th Cir. 1975). Accordingly, this Court holds that defendants are bound by part 209 of title 33, C.F.R.

The Corps' internal regulations, ER 1110–2–1150 and ER 1105–2–507, are subject to a different standard of review. In *Doe v. Hampton*, 184 U.S.App.D.C. 373, 389, 566 F.2d 265, 281 (D.C.Cir. 1977), the court of appeals explained that an unpublished provision "may be binding if so intended" by the agency. It instructed trial courts to ascertain that intent by examining the "provisions' language, its content, and any available extrinsic evidence." ER 1110–2–1150 describes some of its contents as mere principles. Thus, this regulation, like that in *Doe v. Hampton, supra*, is clearly precatory in part. Yet, as in *Doe*, a determination of which portions are precatory and which, mandatory, must be done on a section-by-section basis. The same analysis shall be applied to ER 1105–2–507.

## V. FINDINGS OF FACT

In addition to its finding at part III of this opinion, the Court makes the following findings of fact.

### A. The Corps has Not Complied With Its Own Post-Authorization Regulations.

■ To assess the Corps' post-authorization conduct in this case, one must first understand the rationale behind its behavior. After the Secretary of the Army "authorized" the Locks and Dam 26 project in July, 1969, the Corps commenced its "post-authorization" planning. Between June, 1971 and June, 1975, it issued eleven design memoranda (DMs) (DX 33–43). In 1974, however, this Court ruled that the project had not been properly authorized, 382 F.Supp. 610 (D.D.C.1974); the Corps then complied with this Court's ruling by bringing the matter before Congress. Thus, as a result of the Corps' original misunderstanding about the appropriate authorizing body, the entire post-authorization process had almost been completed by the time Congress approved the new lock and dam in 1978. In May of this year, defendants attempted to comply with their post-authorization regulations by publishing GDM Supp. No. 2, an update of the DMs which would normally have been prepared at that time in the planning process, as required by ER 1110–2–1150.

Plaintiffs apparently recognize that a repetition of the studies performed in the

DMs would be otiose and they do not contend that defendants should be compelled to repeat their prior acts. Their contention is simple: they argue that defendants should have conducted a public meeting to solicit public comments on GDM Supp. No. 2. The Court is persuaded that plaintiffs are correct.

First, section 209.405(f)(5) of title 33, C.F.R., unequivocally provides: "[A]t least one public meeting will be held in connection with the preconstruction planning of authorized projects." This provision reflects the emphasis upon public participation which is expressed in ER 1110–2–1150 ¶ 18 and 33 C.F.R. § 209.405(d) (1978). The Corps contends that section 209.405(f) establishes only "general" advisory rules and that, in this case, the holding of public meetings *before* congressional action renders further hearings unnecessary. *See* DX 63. The Court, however, believes that the strong interest in public participation, which is reflected in other Corps regulations, is persuasive evidence that section 209.405(f)(5) is not precatory. The Corps' NEPA regulations are equally explicit. They provide, "Public meetings . . . will be held during post-authorization planning studies to insure that views of interested parties will be considered in the development of the plan and that all interested parties will be kept informed of study progress. . . ." 33 C.F.R. § 209.-410(n)(ii) (1978). The latter portion of this regulation refers to the very situation confronted by the Court. It states that additional meetings should be held when there is an "unusual time lapse or significant changes in the authorized project." *Id.* Here, it has been four years since the original meetings were held and, in addition, the "authorized" project has changed from a two-lock proposal in 1975, when the only public meetings convened, to one involving a single 1200-foot lock.

Even accepting the Corps' assertion that it is not obliged to follow these provisions in every instance, the Court finds this case is clearly one in which such a hearing should have been held. Lock and Dam 26 is a major project which has, to say the least, attracted extensive public notice. Its economic and environmental impact may eventually be felt in every home and farm in the Midwest. Moreover, at stake is the soundness, utility and beauty of perhaps the greatest water resource on the continent—the Upper Mississippi and its tributaries. In light of the grave importance of this project, the defendants certainly acted arbitrarily in finding that further exchange of information and opinion with the public was unnecessary. Defendants' arbitrariness is heightened by the Corps' failure to hold *any* public meeting on the single-lock proposal. The "extensive hearings" held in 1975 concerned the DSEIS; they preceded the BERH report which first recommended a single 1200-foot lock. Thus, to date, the public has only commented to the Corps upon a two-lock proposal. Finally, the developments over the last three years are significant: the SED and GDM Supp. No. 2 have been issued and the project proposal has been altered drastically. The Corps has clearly erred by ignoring its own regulations which grant the public a right to comment on these developments.

In order to comply with its own regulations, the Corps should conduct a public meeting after due notice for comment and preparation. Moreover, the Corps should delay any final decision on Lock and Dam 26 so that it may reconsider its stand in light of public commentary.

### B. *The Administrative Record is Adequate for Judicial Review.*

Plaintiffs attack the adequacy of the administrative record on the ground that the Corps has failed to include certain raw data which is vital to an evaluation of the FEIS. The Court is persuaded that plaintiffs have no claim to the data which they seek.

The Corps used the data at issue to calculate the rate savings shippers would receive with the expansion of Locks 26's capacity. The Corps' positive findings on this point add measurably to the projected benefits of the proposal. Accordingly, the validity of the rate savings figures is a crucial matter

to those who oppose construction of the new lock and dam. The Corps' rate savings figures are compiled by comparing the actual cost of shipping by barge with the rate on an alternative mode. The data underlying these figures was gathered by Charles R. Donley & Associates, a private consultant hired by the Corps. Most of this data is already available to the plaintiffs; for 231 different shipping movements, plaintiffs know the tonnage, the commodity, its origin, destination and average rate. *See* FER, vol. III, app. I & J (DX 43). Only the rate of a particular movement and the identity of an individual carrier is not disclosed. Defendants submit that this data is confidential proprietary information and that Charles R. Donley & Associates only received this information by guaranteeing its confidentiality.

Plaintiffs have presented this Court with no evidence contradicting the Corps' position that this data is legitimate proprietary information, nor have they argued that the figures used by the Corps are inaccurate. The figures which plaintiffs seek are largely derived from long-term shipping contracts. FER, app. I, at app. I–16. Disclosure of this data is certainly likely to cause substantial harm to the competitive position of the firms from which it was obtained. Accordingly, the Court finds that this information is proprietary and privileged.

 It is well established that an agency is entitled to claim a privilege with respect to documents that might have influenced a particular decision. *National Courier Association v. Board of Governors of the Federal Reserve System*, 170 U.S.App.D.C. 301, 313–314, 516 F.2d 1229, 1241–42 (D.C. Cir. 1975). Indeed, this Court, in its Order of October 21, 1974, ruled that disclosure of similar proprietary information would "compromise the competitive situation" of those interviewed and that non-disclosure would not impair the rights of the plaintiffs. Having examined plaintiffs' evidence, the Court is unpersuaded that it should change its position. Accordingly, it finds the administrative record adequate for judicial review.

## C. *The FEIS Adequately Considers Alternatives to Lock and Dam 26.*

 NEPA requires defendants to include in their FEIS a discussion of "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). Plaintiffs contend that the FEIS fails to address the following three alternatives to the proposed Lock and Dam 26 project: 1) low-cost rehabilitation of the present structure; 2) investment in alternative transportation modes; and 3) improved congestion control. The Court finds that the FEIS's treatment of these alternatives is adequate.

Before detailing plaintiffs' proof, it is important to discuss the special standard of review which trial courts must apply in examining post-authorization alternatives. Although NEPA's rule of reason still governs, this Court must take into consideration, not merely the fact of congressional action, but also the nature of that action. In *Sierra Club v. Adams*, 188 U.S.App.D.C. 147, 154, 578 F.2d 389, 396 (D.C.Cir. 1978), the court of appeals explained, "While subsequent congressional action does not vitiate the need for an environmental impact statement or a discussion of alternatives (unless explicitly stated in the statute), such action does have a bearing on what is considered a reasonable alternative, and a reasonable discussion." In that case, the court approved "somewhat brief" discussions of alternatives "in view of the fact that Congress has authorized United States assistance in constructing a *highway*." 188 U.S. App.D.C. at 154, 578 F.2d at 396 (emphasis in original).

Plaintiffs' allegations regarding the analysis of low-cost rehabilitation alternatives are largely precluded by *Public Law No. 95–502*, § 101(j), 92 Stat. 1695. The Corps originally dismissed the possibility of low-cost rehabilitation as excessively dangerous. FEIS, at 74, 186–188 & 451–453. At trial, plaintiff's expert, Mr. William Wahler, a distinguished engineer and dam safety analyst, testified about both the various low-cost methods of rehabilitating the present Locks and Dam 26 and the flaws in the

Corps' safety inspection of the structure. Yet, regardless of his comments, the FEIS's treatment of this alternative is certainly adequate in light of the legislation authorizing Lock and Dam 26. In section 101(j) of Public Law No. 95–502, Congress expressly directed that the new structure be designed "to provide for possible future expansion." Plaintiffs' evidence fails for the simple reason that the proposed low-cost rehabilitation does not provide for this potential expansion. Hence, it would not comply with the mandate of Congress.

Moreover, even assuming that Public Law No. 95–502 could be construed to permit mere rehabilitation of Locks and Dam 26, plaintiffs' proof would still be deficient. The Corps' engineering expert, Mr. Homer Willis, testified adequately about his differences with plaintiffs' expert, Mr. Wahler. Tr. at 86–118 (Sept. 19). This Court will not attempt to resolve conflicting scientific opinions, thereby substituting its judgment for that of the defendants. *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Based on Mr. Willis' testimony and the comments in the FEIS, the Court is persuaded that the document contains an adequate discussion of low-cost rehabilitation and that defendants had a reasonable basis for their decision to forsake this alternative.

Plaintiffs' allegation that defendants inadequately considered alternative investments in other transportation modes is equally defective. As in *Sierra Club v. Adams, supra*, congressional authorization has favored a specific mode of transportation. Hence, Corps discussion of other modes may be limited. Here, the Corps assumed that alternative investment was really no different from a "no action" alternative. FEIS at 76. Of course, alternative investment would involve no action at Locks and Dam 26 but, in contrast to a "no action" plan, plaintiffs would have the Corps actively explore the investment possibilities of the money currently funding a new lock and dam. Although the Corps has not conducted the major study urged by plaintiffs, it has certainly afforded alterna-

tive transportation fair consideration. *See* FER at 3–11 to 3–29 & 6–71 to 6–105 (DX 43); RDSEIS at 6–93 to 6–134 (DX 147). Moreover, plaintiffs' second alternative does not address the problem of physical deterioration of the present structure. In view of the congressional mandate to invest in the Inland Waterways System, the Court finds the Corps' discussion adequate.

Finally, plaintiffs offer that defendants should have examined methods of controlling congestion at the current structure. They suggest that the imposition of a congestion toll would deter many inefficient tow operators from using the locks. Tr. at 187–189 (Sept. 10). Again, however, this alternative takes into account neither the congressional mandate to provide for expanded capacity, nor the Corps' concern with the structural soundness of Locks and Dam 26. Moreover, plaintiffs' expert conceded that at the present time, the Corps lacks the legal authority to impose a congestion toll. *Id.* at 245. Although it is uncontested that defendants have not explored the possible use of a toll, the Court is unpersuaded that they should be compelled to do so. It would certainly be a waste of agency resources to test the efficiency of an alternative which is not only beyond the agency's power, but also incapable of either fully solving the problem at hand or fulfilling the mandate of Congress. Accordingly, the Court finds defendants' failure to consider the alternative of a congestion control a reasonable decision.

### D. *The FEIS Need Not Consider Proposals for Projects at Other Points on the Two Rivers.*

It is well established that under NEPA an EIS for one project must discuss the impact of other projects which are so related as to be part of the same "action." *Scientists Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 403–404, 481 F.2d 1079, 1087–88 (D.C.Cir. 1973). The cumulative environmental impact of a planned series of related projects cannot be shielded by the preparation of separate EISs. Thus, a trial court must determine

whether various projects before an agency are sufficiently interrelated and sufficiently ripe that the agency is really considering a single proposal. Further, the Supreme Court has construed NEPA to require an impact statement only at the time at which the agency actually "makes a recommendation, or report on a *proposal* for federal action." *Kleppe v. Sierra Club*, 427 U.S. 390, 406, 96 S.Ct. 2718, 2728, 49 L.Ed.2d 576 (1976) (emphasis in original). Plaintiffs contend that the Corps' FEIS is inadequate because it fails to include an assessment of the environmental impacts of the following: 1) a twelve-foot channel for the Illinois and Upper Mississippi Rivers; 2) the Illinois Duplicate Locks project; and 3) the "inevitable" expansion of capacity at all upstream locks. Defendants' response is twofold. First, these projects have not yet ripened into actual proposals; second, the Corps is barred by the express language of Public Law No. 95–502 from either making, or even considering, these alleged proposals. This Court is persuaded that the defendants did not act arbitrarily by failing to include an assessment of the impacts of the alleged proposals in the FEIS for Lock and Dam 26.

At present, the Upper Mississippi River Navigation System employs a nine-foot draft channel. The depth of this channel directly limits barge capacity; with a deeper draft channel, larger barges could traverse the system. Plaintiffs have successfully proven that the sill depth of the proposed 1200-foot lock is designed for a twelve-foot draft navigation. DM No. 2, at ¶ 12–02a(5) (DX 34). However, they have failed to show that a proposal for a twelve-foot draft channel is currently pending before the Corps. First, plaintiffs have not offered any evidence to indicate that the irretrievable commitment of resources to a single deeper draft *lock* will place Congress and the Corps under an obligation—economic or otherwise—to re-dredge the entire Upper Mississippi River Navigation System. Moreover, defendants have shown that the deeper draft sill is independently justified because it will increase the lock's efficiency in handling nine-foot draft barge traffic. FEIS, at 5. In addition, they have shown

that no proposal for expansion is actually under consideration by the Corps. The FEIS explicitly disclaims, "[A] 12-foot channel . . . is not economically justified above the mouth of the Illinois River." *Id.* Finally, the Court recognizes that the legislation authorizing Lock and Dam 26 expressly precludes the proposal which plaintiffs allege is under consideration. Section 102(c) of Public Law No. 95–502, 92 Stat. 1695, provides, "[N]either the Secretary of the Army nor any other Federal official shall study the feasibility of deepening the navigation channels in . . . the Mississippi River north of Cairo, Illinois . . . and the Illinois River . . . unless specifically authorized by an Act of Congress." In light of the foregoing, the Court finds that defendants need not consider the environmental impact of a twelve-foot draft channel in their FEIS for Lock and Dam 26.

Similar flaws underlie plaintiffs' allegations concerning the Illinois Duplicate Locks Project. Although a General Design Memorandum for this project was prepared in December, 1974 (PX 516), there is clearly no pending proposal to complete the project. Section 101(i) of the authorizing Act precludes any project that would expand the capacity of the present system, until Congress has approved the master plan, called for in section 102(a), on the development of the waterways system. Thus, by statute, Congress has forced the Corps to withdraw what might have earlier been a pending proposal. Moreover, as with the deeper channel, plaintiffs have failed to show that a new lock and dam at Alton will necessitate new locks on the Illinois River. The Corps' evidence clearly indicates that a new 1200-foot lock will not constrain the capacity of the smaller locks on the Illinois. *See* part VF *infra.* Hence, the Corps did not act arbitrarily in declining to assess the impacts of expanding the capacity of locks on the Illinois River.

Having determined that the FEIS need not address the Illinois River expansion, the Court finds, *a fortiori,* that the document need not treat expansion on the Upper Mississippi. No design memorandum has even

been prepared for this possibility and lock expansion on the Mississippi is also precluded by Public Law No. 95–502. Accordingly, the Court finds that defendants did not act arbitrarily by declining to assess the impact of lock expansion on the Upper Mississippi.

E. *The FEIS Adequately Examines the Environmental Impact of Increased Usage of the Inland Waterways System.*

■ Of course, the *sine qua non* of every EIS consists of an analysis of the environmental impacts of the proposed project. Plaintiffs argue that the FEIS contains no genuine assessment of the systemic biological impact of either the present barge traffic or the increment in traffic caused by expanding the capacity of Locks 26. This impact is systemic because traffic from the lock moves up and down the length of the two rivers.

All parties agree that determining the environmental effect of river usage is a two-step process. First, one must determine the physical effects of barge traffic; one may then use this information to measure biological impacts. The short-term physical effects of barge traffic are fairly well known. The swift current passing between the barge bottom and the channel floor picks up bottom sediment and creates a plume of resuspended sediment to the stern of the barge. Because this sediment may remain resuspended for one to three hours, plumes can stretch for as long as two miles. Tr. at 99–101 (September, 11); PX 570. Once the sediment has been resuspended, it is carried laterally, by the main channel flow, into backwater areas on the Illinois and Upper Mississippi Rivers. Plaintiffs' expert, Dr. Claflin, indicated that the passage of a single tow could cause up to 2,700 pounds of sediment to be introduced into an adjacent backwater area. This sediment also affects the turbidity of the river. Further, tow traffic creates wave wash which causes bank erosion. In addition, a tow can draw water away from, and out of adjacent side channels, thereby exposing the river bottom. The flow of the river may also be reversed following the passage of a tow.

■ The Corps' treatment of the long-term systemic biological impact of these physical effects appears on pages 53 to 59 of the FEIS. This discussion is based on four studies which center around the physical impacts of tow traffic. The Corps declined to engage in extensive biological research because its reports indicated that the physical effects of increased tow usage would be minor. The Court finds that the Corps' conclusion was reasonable and that the FEIS adequately discusses the nature of the systemic environmental impacts.

■ NEPA does not impose an obligation upon federal agencies to examine every conceivable environmental consequence. Rather, the agency must look to current data to determine which impacts will occur and which potential impacts merit further research to determine the likelihood of their occurrence. Where lack of research leads to uncertainty, or gaps in knowledge, the EIS must point out this shortcoming. In *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir. 1973), the court of appeals explained, "Neither § 102(2)(B) nor (C) [42 U.S.C. §§ 4332(2)(B) & (C)] can be read as a requirement that complete information concerning the environmental impact of a project must be obtained before action may be taken. If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated." Here, the Corps has adequately explained the environmental uncertainty associated with Lock and Dam 26 and it did not act arbitrarily in declining to engage in research necessary to cure the uncertainty.

First, the FEIS does disclose the environmental impacts likely to follow construction. It explains that turbidity may interfere with fish habitats and the photosynthesis of aquatic plants and that increased sediment drift into side channels may alter the ecology of these backwater areas. FEIS, at 24–25 & 53–68. The report, however, concluded that the physical impact of increased usage was minimal and would

probably pose no threat to the environment. A single 1200-foot lock would only lead to a capacity increase of eighteen percent; in terms of tows per day, this would mean approximately three more tows a day on each of the two rivers. FEIS, at 72. Moreover, the Corps' studies showed that the sediment which would reach backwater areas because of tow traffic would still be deposited if there were *no* traffic. Tr. at 256 (Sept. 18). Evidently, during periods of high flow, the river itself presently transports sediment and deposits it in these backwater areas. *Id.* at 255–257. With respect to turbidity, the studies showed that tow passage did not raise turbidity to dangerous levels on the Mississippi and that dangerous levels existed on the Illinois regardless of tow passage. RSDEIS, at 4–64 to 4–65. Although a quantification of these minor physical impacts is within the state of the art, such a study would take from five to ten years. Tr. at 261 (Sept. 18); *Id.* at 191 (Sept. 11). The Corps, therefore, concluded that the physical impacts created by three tows per day did not justify the time and expense (approximately five to ten years and several million dollars) needed to assess the attendant environmental effects. Significantly, prior to this decision, the Corps did commission a brief study of the environmental impacts upon the fragile ecosystem of the Illinois River. That study relied on currently available data and did not involve original research. The study was unable to conclude that the projected increase in tow traffic would have a significant biological impact. Finally, the FEIS fully points out the gaps and uncertainty of the Corps' approach. RSDEIS, at 4–55 to 4–72 & 9–89 to 9–94.

Plaintiffs contend, in essence, that the Corps' failure to perform a study of the long-term systemic ecological impacts of the proposal precludes any bona fide conclusion about those impacts. Thus, in order to fully apprise the decision-maker of the environmental effects of Lock and Dam 26, plaintiffs would have defendants devote five to ten years to gathering raw data and preparing a report. Plaintiffs, however, offer no evidence other than testimony of the experts who dispute the Corps' basic findings on the physical impacts of tow traffic. They have not shown that those studies were improperly performed or that the Corps' conclusions were arbitrary or capricious. Accordingly, the Court is persuaded that the FEIS adequately discloses both systemic environmental uncertainties and impacts alike. It finds that defendants' failure to perform an in-depth study of the environmental effects of an eighteen percent increase in tow traffic was neither arbitrary, capricious, nor violative of NEPA.

## F. The Defendants Decision to Build Does not Violate NEPA.

■ NEPA imposes procedural and substantive obligations on the defendants. This Court has already held that defendants did not violate their procedural obligations by failing to investigate the systemic environmental impact of increased tow traffic or to consider other alternatives or proposals. To assess their conduct with respect to the substantive mandate of section 101(b) of NEPA, 42 U.S.C. § 4331(b), the Court must determine whether "the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." *Calvert Cliffs Coordinating Committee v. United States Atomic Energy Commission,* 146 U.S. App.D.C. 33, 39, 449 F.2d 1109, 1115 (D.C. Cir.1971). Having found that defendants included adequate environmental data in their FEIS, the Court is also persuaded that they gave sufficient weight to environmental values. Plaintiffs, however, submit that the Corps' substantive decision is flawed in other respects. Specifically, plaintiffs claim that defendants erred by: 1) failing to properly quantify congestion on the Illinois River; 2) omitting the costs of system-wide maintenance; and 3) failing to treat certain railroad losses as costs.[11] The Court finds

11. *See* part IA, *supra* and part VG, *infra.* The Court only considers these allegations in the NEPA context.

that none of plaintiffs' charges provide a basis for holding defendants in violation of NEPA.

■■■ Plaintiffs contend that the Corps has grossly underestimated the growth of internal (*i. e.,* non-Lock and Dam 26) traffic on the Illinois River. They submit that current Corps data indicates that coal and sludge traffic will expand rapidly; this expansion will increase delay losses on the Illinois River, lead to greater usage (and therefore congestion) on the Upper Mississippi, and create even more coercion for expanding the Illinois lock system. The Corps' economic expert, by contrast, believes that internal traffic will not increase measurably and that the Illinois locks will be able to handle future traffic growth without constraint. The only data upon which plaintiffs rely is taken from a GDM prepared by the Corps' Chicago District for the Illinois Duplicate Locks proposal (hereinafter "Chicago GDM"). Tr. at 121–128 (Sept. 10); Chicago GDM, at tables B–26 & B–32 (PX 316). Yet, other portions of the Chicago GDM explain that the predictions offered by plaintiffs rest on the supposition that lock capacity will expand. Without this expansion, the report indicates that coal and sludge traffic can be expected to remain at current levels. *See* Chicago GDM, at table B–38. In addition, more recent data supports the Corps' conclusions on internal traffic growth. Tr. at 35 & 136 (Sept. 19). Accordingly, the Court finds that the Corps did not act arbitrarily in deciding not to adopt the figures which plaintiffs have selected out of context from the Chicago GDM.

As a variation on their claim regarding internal traffic growth, plaintiffs contend that the Corps' cost/benefit analysis rested upon the assumption that new 1200-foot locks were in place along the Illinois River. The replacement, on paper, of the present 600-foot locks theoretically cuts down on delays, thereby increasing benefits to barge shippers. Defendants reply that their conclusion that there would be no significant

upstream congestion was not based on the assumption that 1200-foot locks were in place on the Illinois River. The charts containing the alleged paper replacement appear at tables 3 & 4 of the FEIS. Although table 4 may be confusing,[12] other sections of the FEIS clearly indicate the Corps' assumption that traffic on the Illinois would not expand beyond existing 600-foot lock capacity. The preface states, "No system improvements are required to move this tonnage; therefore, there are no system costs attributable to the proposal." FEIS, at 5. Table 1 also contains tonnage figures which support the Corps' conclusion. Having found that capacity would not be constrained with 600-foot locks, the Corps decided it could use data based on an equally constraint-free 1200-foot lock system. In light of the foregoing, the Court is not persuaded that this decision was improper.

■■■ Plaintiffs are also incorrect in their allegations regarding defendants' failure to treat system maintenance as a cost. On cross-examination, the Corps' economic expert conceded that the costs of maintaining the Inland Navigation System had been omitted from the project's cost/benefit analysis. Tr. at 55–59 (Sept. 19). Yet, this expert fully explained the rationale for the omission. *Id.* at 151. The Corps assumes that the costs of operating and maintaining the present system will be paid regardless of further construction; thus, it neglects not only these costs, but also the benefits derived from the system. This exclusion allows the Corps to limit its review to the proposed improvement's incremental costs and incremental benefits. Indeed, the Corps correctly submits that its own regulations compel an incremental analysis. *See* 33 C.F.R. §§ 290.9(c) & 295.4 (1978). Moreover, the FEIS clearly indicated the type of analysis employed, *compare* FEIS, at 329 *with id.,* at 436. The Court finds that this approach is entirely reasonable and that defendants did not act arbitrarily by overlooking system costs.

---

12. The footnote on this table evidently refers to plans other than the recommended plan. *Com-*

*pare* FEIS, at 74 *with* RSDEIS at 6–20, 6–149 & 6–168 to 6–177.

Finally, plaintiffs assert as error defendants' failure to treat certain railroad losses as costs. These losses are the $135.1 million in revenues which railroads are projected to receive if the new lock is not constructed. FER, at ¶ 6.03(i)(1) (DX 43). The Corps excluded these "losses" for two reasons. First, it decided that there is not a real loss because the revenue is merely potential gains which may never accrue. Secondly, the potential revenue in question will merely be transferred to other carriers and thus, these transfer payments will not result in any real loss to the national economy. Tr. at 158 (Sept. 19). Plaintiffs further contend that forty percent of this projected revenue goes to fixed costs and that a loss in this area is not a mere transfer payment. The Corps, however, rejected this percentage as excessive and found further that small losses to fixed costs could be offset by gains which railroads would derive from increased usage of the rivers. Finally, although rail revenues may have been omitted from the cost/benefit analysis, this impact was fully discussed in other portions of the FEIS. FEIS, at 67. Accordingly, the Court finds that the Corps' decision to ignore rail revenues was rational and not misleading.

G. *There Has Been no Change in the Material Circumstances Underlying the Corps Substantive Decision in the Post-Authorization Period.*

This Court has already indicated that it will not review plaintiffs' claims that defendants' post-authorization decision does not comply with the substantive requirements of parts 290 to 295 of title 33, C.F.R. *See* part IA, *supra*. Plaintiffs submit that defendants have omitted the following four matters from their cost/benefit analysis: 1) the future costs of maintaining the entire Upper Mississippi Navigation System; 2) the projected losses to railroads which compete directly with river users; 3) the losses resulting from delays at upstream locks; and 4) the systemic environmental damages caused by increased use of the two rivers. These omissions are alleged to violate Corps regulations.

The Court finds that the facts underlying each of these omissions were fully developed at the time Congress approved the cost/benefit analysis and further, that no new facts relating to these claims have occurred in the months following authorization. Accordingly, the Court shall dismiss plaintiffs' claim that defendants have failed to comply with their own substantive post-authorization regulations. *See* part IA, *supra*.

### H. *Conclusion.*

In sum, the Court finds that the FEIS provides the Corps with sufficient information, both environmental and economic, to make an informed decision about the merits of the Lock and Dam 26 proposal. It finds further that the Corps' decision to go forward with construction was neither arbitrary, capricious nor did it give insufficient weight to environmental values.

## VI. *CONCLUSIONS OF LAW*

Based on part III and part V of this opinion, the Court makes the following conclusions of law.

1. The defendants post-authorization administrative decision is subject to judicial review under 5 U.S.C. § 706.

2. The Corps' failure to conduct a public meeting after appropriate notice, violates 33 C.F.R. §§ 405(f)(5) & 209.410(n)(ii) and ER 1110–2–1150 ¶ 18.

3. The administrative record is adequate for judicial review, despite the absence of raw data which is bona fide confidential business information.

4. The Corps' failure to conduct a study of the long-term systemic environmental impacts of increased barge traffic on the Illinois and Upper Mississippi Rivers does not violate 42 U.S.C. & 4332(2)(C).

5. The FEIS adequately details alternatives to the proposed plan and complies with sections 102(2)(C)(iii) & 102(2)(E) of NEPA, 42 U.S.C. §§ 4332(2)(C)(iii) & 4332(2)(E).

6. The FEIS's failure to examine the environmental impact of a twelve-foot channel, of expanded locks on the Illinois

River, and of further expansion on the Upper Mississippi River, does not violate section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).

7. The defendants adequately studied barge traffic on the Illinois River as well as revenue loss to rail carriers; its treatment of this information is neither arbitrary, nor capricious, nor in violation of section 102(2)(C) or 101(b) of NEPA:

8. The defendants' failure to weigh system-wide maintenance costs in balancing costs against benefits was neither arbitrary, nor capricious, nor in violation of section 101(b) of NEPA.

9. The defendants' conclusion that benefits exceed costs for Lock and Dam 26 is neither arbitrary, nor capricious, nor in violation of section 101(b) of NEPA.

## VII. *REMEDIES*

 Having found that plaintiffs have prevailed on Count XI of their Amended Complaint, the Court must now determine the appropriate remedy. Plaintiffs seek an injunction as well as a declaratory judgment. In the interest of comity, the Court will enter a declaratory judgment in favor of plaintiffs, but will not provide injunctive relief.

This Court has previously examined the role of declaratory relief of the NEPA context. 431 F.Supp. 722, 730 (D.D.C.1977). In that decision, the Court explained that "declaratory relief alone is sufficient to enforce NEPA's EIS requirement" because "the Court can assume that if it determines that the final EIS is inadequate, then the defendants would correct the deficiencies in the EIS 'without the coercion of a Court order.'" *Id.* (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 575, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975)). By the same analysis, the Court also concludes that defendants will comply with their own regulations once a violation has been found. In the past, defendants have accepted this Court's decrees

and the results have certainly been ameliorative: the American public, through their representatives in Congress, have benefited from the opportunity to evaluate, modify, and approve construction of a new lock and dam at Alton, Illinois. This involvement certainly constitutes a victory for the environment. The Court presumes that defendants will continue to abide by a course of behavior which will further the ends of justice. The Court finds, nonetheless, that injunctive relief would not be appropriate in this instance.

 The court of appeals for this circuit has recently explained, "The decision in each case whether the preservation of an agency's options upon reappraisal justifies the costs of delay rests, of course, in the sound discretion of the court." *Realty Income Trust v. Eckerd*, 183 U.S.App.D.C. 426, 436, 564 F.2d 447, 457 (D.C.Cir.1977). In making that decision, the Court must balance the parties' interests as well as the public interests; here, this balancing indicates that injunctive relief would be inappropriate. First, and more importantly, the public interest lies in the continued pre-construction planning of Lock and Dam 26. The Court accepts Public Law No. 95–502, enacted after more than a year of congressional debate, as the definitive statement on the public interest. Although the Corps' regulations may also serve an important public purpose, they should not be permitted to delay an Act of Congress when the legislative decision reflects a close consideration of the project at issue. Second, plaintiffs would certainly receive no benefit from further public meetings. They have already participated vigorously at the administrative and legislative levels and they have proffered no new ideas which they wish to tender at a public meeting. In light of the major significance of this project, the public too has already received an extensive opportunity to comment through—and to—their representatives in Congress.[13] More-

---

13. A public meeting under 33 C.F.R. 209.405(d) is not the same as a legislative hearing; the two, however, serve similar purposes.

over, Congress devoted twelve days of hearings to the merits of the Lock and Dam 26 proposal and the Act, which was ultimately approved, eliminates the Corps' discretion in the project planning. As a result, a public meeting would hardly assist defendants in their planning options. It is well established that "equity should not require the doing of a 'vain or useless thing'" *Id.* 183 U.S.App.D.C.at 438, 564 F.2d at 458. Finally, the delay involved in scheduling a meeting would certainly hinder the Corps' work and thereby, harm defendants. Thus, in light of Congress' clear expression of public interest and the lack of injury to plaintiffs, the Court declines to issue an injunction.

The Court's decision, however, does not preclude defendants from re-evaluating their own conduct. The Court's failure to provide the extraordinary relief of an injunctive writ does not mean that defendants might not, on their own, decide to comply with their regulations. Indeed, although the Court will not require a public meeting, it urges defendants to conduct their own evaluation of the situation and to hold a meeting if they find that one may be reasonably scheduled.

## VIII. *CONCLUSION*

The Court today finds that the defendants have failed to comply with their own regulations. Compliance would involve, at the very least, an opportunity for the public to comment, after due notice, on GDM Supp. No. 2 as well as other aspects of the proposed project. The Court has also ruled on plaintiffs' claims regarding deficiencies in the FEIS, and found that none of their allegations has merit. Court approval of the FEIS, however, should not be construed as approval of the project proposal contained in the FEIS. In preparing the document and in selecting a recommended plan, the Corps has been required constantly to choose between alternatives; plaintiffs have contended those choices were arbitrary or capricious or in violation of NEPA. As a part of its review of plaintiffs' allegations, the Court has found that the Corps did not act arbitrarily or illegally. That finding is certainly not a judicial seal of approval for the choices which the Corps has made. Similarly, the Court's decision may not be construed as a finding that the alternatives which defendants have rejected are improper or unsound.

If defendants elect to hold a public meeting and to reconsider their final decision on Lock and Dam 26, they must receive public comments with an open mind. A public meeting after an agency has already made its decision would be an empty gesture. *National Tour Brokers Association v. ICC,* 192 U.S.App.D.C. 287, 591 F.2d 896 (D.C.Cir. 1978). Because the Court's decision today does not involve an assessment of the wisdom of the Corps' conduct, its approval of the FEIS would not interfere with either defendant's objectivity or the public's right to comment.

An order in accordance with the foregoing will be issued of even date herewith.

[See following illustration.]

**1004**

LEGEND

 Existing Navigation Routes

■■■ Under Construction

Mississippi River Inland Waterways System and Gulf Intracoastal Waterway.

Figure 1-1.